John ANDRADE, individually and as parent and natural guardian for Joseph J. Andrade, and Dennis W. Aasen, individually and as parent and natural guardian for Jerrett J. Aasen, Respondents,

v.

Elizabeth ELLEFSON, et al.,
Defendants,

County of Anoka, Petitioner, Appellant.

No. C4–85–554.

Supreme Court of Minnesota.

Aug. 15, 1986.

Robert M.A. Johnson, Anoka Co. Atty., Thomas G. Haluska, Asst. Co. Atty., Anoka, for appellant.

F. Dean Lawson, John F. Laue, Minneapolis, for respondents.

SIMONETT, Justice.

This case raises issues of tort liability and governmental immunity for a county's role in state licensure of day care facilities. We conclude a tort duty of care is owed the plaintiffs and that the county has governmental immunity which, however, has been waived to the extent of the county's liability insurance. For the reasons set out, we affirm in part and reverse in part the court of appeals' decision.

Plaintiffs are two infants, Joseph J. Andrade and Jerrett J. Aasen, who by their fathers bring this action for personal injuries against defendants Elizabeth Ellefson and her husband, operators of a day care center in Anoka County, and against defendant County of Anoka. On December 12, 1982, Joseph Andrade, age 7 months, was injured while at the Ellefson day care center, apparently sustaining a skull fracture and developing epilepsy. On May 26, 1983, Jerrett Aasen, age 7 months, sustained serious injuries while at the Ellefson home, apparently consisting of a subarachnoid hemorrhage, consistent with either a fall or a violent shaking. The child was found to also have a 2– to 4–week–old arm fracture.

Plaintiffs allege a special relation between themselves and Anoka County giving rise to a special duty on the part of the county to perform its governmental function of license inspection and supervision of the Ellefson day care home with due care, and that this duty was negligently performed, causing the children's injuries. The trial court granted the county's motion for summary judgment and, to permit immediate appeal, found no just reason for delay and directed entry of judgment. Minn.R.Civ.P. 54.02; Minn.R.Civ.App.P.

104.01. The trial court felt there was a fact issue on whether a special relation existed, but dismissed the action on the grounds of governmental immunity. The court of appeals ruled a special duty existed as a matter of law on this record and, further, that there was no immunity. *Andrade v. Ellefson*, 375 N.W.2d 828 (Minn. Ct.App.1985). We granted the county's petition for further review.

Licenses for day care centers are issued by the Commissioner of Human Services for the State of Minnesota, with the assistance of local county welfare agencies in conducting on-site evaluations and inspections. *See* Minn.Stat. § 245.804 (1984). Ellefson was originally licensed in December 1974 to care for a maximum of five children in her home.[1] From 1975 through 1979, personnel from the Anoka County Community Health and Social Services Department conducted an annual relicensing inspection, and each year recommended license renewal. The initial 1974 report said Leslie Ansleigh, 21, who came from a foster home for retarded teenagers, was living in the home;[2] however, Terry Nagel, the county investigator from 1974 to 1980, testified she did not recall Leslie Ansleigh residing there during those years. The 1975 inspection report noted Ellefson sometimes took care of eight or nine children, but not always at the same time. In April 1979, Ellefson voluntarily stopped providing day care, informing the county she wanted to work outside the home. In January 1980, Ellefson applied for reissuance of her license, which was granted on the county's recommendation. Annual inspections were conducted each year thereafter, except for 1981 when the county apparently forgot to do one.

The annual inspections were always scheduled with the home operators. James Eyer, who was the county inspector from 1980 on, conducted two unannounced inspections of the Ellefson home in response to complaints of overcrowding. In January 1982, Eyer made a surprise visit and found six children, one over the maximum, but was told it was one child's last day. Eyer concedes he only checked the main floor of the house. Another time Eyer drove by the Ellefson home to check a complaint that the Ellefsons' backyard was full of children but Eyer did not see any children in the yard. In making his January 1982 annual inspection, Eyer says he probably met Leslie Ansleigh and was aware Leslie was partly involved in taking care of the children.

When Joseph Andrade was injured in December 1982, an investigation of the home was conducted by Barbara Ingrassia of the Anoka County Child Protection Unit to determine if the child had been abused. By the time of this lawsuit, the file had been destroyed pursuant to statute, indicating any report of physical abuse could not be substantiated.[3]

In January 1983, Ellefson was again inspected for license renewal, and Eyer says Ellefson told him Leslie was no longer living in the home. As part of the inspection, the county had also sent out evaluation forms to some of the parents. There were no negative responses; Joseph Andrade's mother returned a very favorable evalua-

---

1. The original license was issued by Anoka County. With the enactment of the Public Welfare Licensing Act in 1976, Minn.Stat. §§ 245.-781 to .812 (1976), the issuance of day care licenses was taken over by the state.

2. Plaintiffs argue the county should have investigated Leslie Ansleigh's background at this time. It appears, however, that investigation of all persons residing in the household was not required until a 1981 amendment to Minn.Stat. § 245.783, subd. 3. *See* 1981 Minn.Laws Ch. 290, § 5. Until then, the law required only the applicant's background be checked. Even so, Nagel's 1974 report states, "Mrs. Ellefson and

her husband feel that Leslie is not retarded, but is very slow in particularly his emotional development. He is employed nights as a maintenance department worker and sleeps during the day. Mrs. Ellefson said that he does not have a great deal of contact with the children * * *."

3. Minn.Stat. § 626.556, subd. 11 (1984), provides for the destruction of such records: (a) after 30 days if the report is found to be unsubstantiated; (b) after 7 years if the report is found to be substantiated; and (c) after 1 year if the report can neither be substantiated nor disproved.

tion with no mention of her infant's injury. (Indeed, at no time apparently did any of the parents ever complain to the county about overcrowding or other problems.) Again the Ellefson license, on the county's recommendation, was renewed. About 5 months later, on May 26, 1983, plaintiff Jerrett Aasen sustained his injuries.

On Friday, May 27, 1983, the day after the Aasen incident, Eyer and Ingrassia went to the Ellefson home and found 13 children in the home, all on the main floor. Ingrassia reported the house was hot, dark, and overcrowded, and that the children were all strangely silent. The following Monday, Eyer went to the home but was denied entrance. On June 2, Ellefson's day care license was suspended. Subsequently, the license was revoked on the county's recommendation which was based on the circumstances of the Aasen injury, the presence of 13 children in the home on May 27, the fact the inspector had been denied entrance, and because the county had since learned of alleged incidents of sexual abuse by Leslie Ansleigh several years before. As to this last item, the county discovered that Ellefson had stopped providing day care in April 1979, not because she wanted to work outside the home as she had stated, but because two mothers had discovered their daughters had been molested by Leslie. The mothers had agreed not to report the incidents in return for Ellefson's promise to stop providing day care and to seek professional help for Leslie.

In claiming the county's inspections were inadequate and negligently performed, plaintiffs rely heavily on the deposition testimony of Jane Wedlund. From 1971 to 1984, Mrs. Wedlund was Ellefson's next-door neighbor and, for about the last 4 years, operated a licensed day care center in her home, too. Wedlund testified she made numerous complaints to Anoka County welfare authorities about overcrowding in the Ellefson home, but her complaints were ignored and, at least once, she was told she was a troublemaker and should mind her own business. It is unclear if Wedlund ever complained to the county about physical child abuse in the Ellefson home.

Inspector Terry Nagel testified she recalled conversations with Wedlund in early 1979, possibly on overcrowding, but does not remember if the complaints were investigated. Inspector James Eyer concedes Wedlund made several calls, but apparently he did not give much credence to the complaints because they seemed, in part, bizarre (*e.g.*, Leslie Ansleigh was being held as a slave by Betty Ellefson and the Ellefsons had a secret tunnel between their house and garage), and because he felt Wedlund's motives, as a competing day care provider, were suspect. Another county employee, Sandra English, testified Wedlund made several "far-fetched" accusations. Nonetheless, it was because of Wedlund's complaints that Eyer made the two previously mentioned nonscheduled visits to the Ellefson home.

For there to be a claim of tort liability, the county, as a governmental unit, must owe the plaintiffs a duty different from that owed the general public. This issue involves *Cracraft v. St. Louis Park,* 279 N.W.2d 801 (Minn.1979), where we discussed the factors involved in determining whether a special duty exists. If, however, the county is immune from tort liability, as the trial court found, we need not reach the special duty issue, so we will discuss governmental immunity first.

## I.

1. Under Minn.Stat. § 466.03, subd. 6 (1984), a political subdivision is not liable for "discretionary acts." Contrary to its contention, we hold the defense of discretionary act tort immunity is not available to Anoka County here. The license inspections conducted by the county were not at the planning or policy level where discretionary immunity usually applies. *See Wilson v. Ramacher,* 352 N.W.2d 389 (Minn.1984).[4]

4. Plaintiffs also seem to argue their injuries are

due to inadequate funding for licensing and

■ 2. Anoka County, however, raises a further immunity defense. It contends that in its licensing activities it was acting on behalf of the State of Minnesota, and, as an "employee" of the state under Minn. Stat. § 3.736, subd. 3 (1984), it shares the state's governmental immunity. We agree.

Minn.Stat. § 3.736, subd. 3 (1984), provides:

> Without intent to preclude the courts from finding additional cases where the state and its employees should not, in equity and good conscience, pay compensation for personal injuries or property losses, the legislature declares that *the state and its employees are not liable for the following losses:*
>
> *       *       *       *       *       *
>
> (j) Any loss based on the failure of any person to meet the standards needed for a license, permit, or other authorization issued by the state or its agents. [Emphasis added.]

An "employee of the state" is defined broadly as including "persons acting on behalf of the state in an official capacity, temporarily or permanently, with or without compensation." Minn.Stat. § 3.732, subd. 1(2) (1984). In general, the term "person" includes bodies politic and corporate. Minn.Stat. § 645.44, subd. 7 (1984).

Here, unquestionably, Anoka County was "acting on behalf of the state in an official capacity." The Commissioner of Human Services is authorized to enlist the help of county welfare agencies to investigate day care licensing. Minn.Stat. § 245.-804, subd. 1 (1984) ("In conducting evaluations and inspections, the commissioner may call upon and receive appropriate assistance from other governmental agencies within their authorized fields."). Pursuant to rules promulgated by the commissioner, applications for day care licenses are to be made to the local county welfare department, which is the "duly delegated representative of the commissioner." Minn.R.

§§ 9545.0310, subp. 1, 9545.0320, subp. 3 (1985). The local agency evaluates the applicant and "shall" recommend licensure if the minimum standards are met. Minn.R. § 9545.0320, subp. 5. The local agency is also required to make annual evaluation visits. *Id.* at subp. 7.

True, the state immunity statute, section 3.732, subd. 1(1), expressly excludes a county, as a political subdivision of the state, from being included within the definition of the "state," but this does not mean a county cannot, in certain circumstances, be an "employee" of the state. There is no inconsistency in saying, on the one hand, that the county, as a principal carrying out county functions, does not enjoy the state's immunity, while, on the other hand, saying that when the county acts for the state in performing a responsibility assigned to the state but delegated by it to the county, that the county partakes in the state's immunity. The court of appeals' ruling of no governmental immunity is reversed.

■ 3. While Anoka County has governmental immunity, we hold it has waived its immunity to the extent of its liability insurance. Minn.Stat. § 466.06 (1984) authorizes the governing body of any municipality (which includes a county) to procure insurance for its tort liability and provides that "[t]he procurement of such insurance constitutes a waiver of the defense of governmental immunity to the extent of the liability stated in the policy * * *." The statute provides that insurance coverage may "includ[e] torts specified in section 466.03 for which the municipality is immune from liability." If we then look at section 466.03, which lists those claims excepted from tort liability, we see that subdivision 7 covers "[a]ny claim against a municipality as to which the municipality is immune from liability by the provisions of any other statute."

Here Anoka County was immune from tort liability as an employee of the state

---

inspections. There were, it appears, 650 licensed day care centers in Anoka County in 1983, yet apparently a very small inspection staff. We agree, on this record, that fund allo-

cation is an immune discretionary function. *See Silver v. City of Minneapolis,* 284 Minn. 266, 170 N.W.2d 206 (1969).

under "any other statute," namely section 3.736, subd. 3, but by procuring liability insurance under section 466.06 it waived that immunity to the extent stated in its insurance policy.

## II.

We now reach the more difficult question: Does Anoka County owe plaintiffs a special duty, different from the duty owed the general public, for breach of which tort liability may be imposed on the county? We conclude a special relationship giving rise to a tort duty exists.

1. Generally, unless there is some kind of "special relation," a person has no common law duty to prevent a third person from injuring another. *E.g., Olson v. Ische*, 343 N.W.2d 284, 288 (Minn.1984); Restatement (Second) of Torts § 315. For example, Mrs. Wedlund, the next-door neighbor, was under no legal duty to the children in the Ellefson home to prevent Mrs. Ellefson from injuring them. Nor would Anoka County ordinarily be under any such duty. But what if, as here, Anoka County undertakes to inspect and evaluate day care centers for licensing purposes?

In *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801 (Minn.1979), this court distinguished between the many functions in which the government protects the general public and those instances where the municipality assumes a special duty owed to certain members of the public. *Cracraft* involved a suit against a city for failure to discover a fire code violation; we held the city, by enacting a fire code ordinance, did not undertake the responsibility of protecting anyone in particular from the risk of fire. Rather, we said, fire inspections protect the interests of the city as a whole. *Cracraft* did recognize, however, there may be instances where the municipality assumes a duty to act for the protection of specific individuals for the breach of which a negligence action will lie. Although there "is no bright line," we noted "at least

four factors" relevant to the existence of a special duty: (1) actual knowledge by the municipality of the dangerous condition, (2) reasonable reliance on specific representations of the municipality, (3) a statutory duty for municipal protection of a particular class, and (4) municipal action which increases the risk of harm. *Id.* at 806–07. In *Hage v. Stade*, 304 N.W.2d 283 (Minn. 1981), we reaffirmed *Cracraft* and, in applying the four factors, found no tort action against the state for hotel guests who were killed in a hotel fire because the state fire inspector allegedly failed to perform his inspection duties.

The regulatory and licensing presence of the state and its political subdivisions in the affairs of the public is pervasive. If there were blanket liability, it would be a rare lawsuit where some unit of government would not be sued. If one accepts the premise, as we do, that not all government presence may impose potential tort liability on the government, then some test like *Cracraft* is needed to discern those instances where the state should be liable for not protecting against the acts of someone who injures someone else. This is not a matter of sovereign immunity any more than a claim against Mrs. Wedlund would involve sovereign immunity. As we said in *Cracraft*, there is no bright line, and each situation will require its own analysis. The four *Cracraft* factors are helpful, however, and on occasion there may be other relevant factors as well. We might add, too, as to the four *Cracraft* factors, that while they should all be considered, all four need not necessarily be met for a special duty to exist. We now turn to the licensing of the Ellefson home.

■ 2. Actual knowledge of a dangerous condition tends to impose a special duty to do something about that condition. Actual knowledge, not mere constructive knowledge, is required. *Hage*, 304 N.W.2d at 288 n. 2. It is doubtful the county had actual knowledge of any physical or sexual abuse of the children at the Ellefson home,[5]

---

5. Although Wedlund testified she was aware of

child abuse (*e.g.,* she says Ellefson told her a

nor do we think plaintiffs' claim that the county had knowledge of "warning flags," by itself, meets the *Cracraft* test. There is, however, some evidence the county had actual knowledge of overcrowding. In her December 1975 relicensing report, the county inspector notes, "I believe that there are sometimes eight or nine children all together although the youngsters aren't there always at the same time." Again, during an unannounced inspection in January 1982, the inspector found six children on the ground floor of the home but did not check further. The most that can be said is this actual knowledge, particularly when the county had been put on repeated notice by the next-door neighbor of overcrowding, raises a fact issue on whether the *Cracraft* actual knowledge test has been met.

3. It is doubtful whether the second factor—reasonable reliance by plaintiffs on the county's representations and conduct—is met. Jerrett Aasen's father says, by affidavit, he and his wife relied on the fact the Ellefson home was supervised and licensed by the state and the county, but "reliance on the inspection in general is not sufficient * * *. [T]he reasonable reliance must be based on specific actions or representations which cause the persons to forgo other alternatives of protecting themselves." *Cracraft*, 279 N.W.2d at 806–07 (footnote omitted). The parents here offer no specific acts of the county on which they relied.

4. It is the third *Cracraft* factor, however, that is decisive in this case. "[A] duty of care may be created by an ordinance or statute that sets forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole." *Id.* at 807. While the Public Welfare Licensing Act covers the licensing of a variety of facilities, we think, as to day care facilities, the Act clearly mandates that small children in a licensed day care facility are a particular protected class. The class consists of uniquely vulnerable persons: small children, often infants, left by their working parents in a home other than their own, and left in the care of another person for some period of less than 24 hours of the day. *See* Minn.Stat. § 245.782, subd. 5 (1984). Provisional licenses for such a facility may, for example, only be issued if any "deviations do not threaten the health, rights, or safety of persons to be served * * *." Minn.Stat. § 245.783, subd. 3 (1984). By Minn.Stat. § 245.802 (1984), state commissioners were instructed to conduct a comprehensive study and prepare a report to the legislature by February 1, 1985, on recommendations for regulations "that will ensure a safe environment for children." The commissioner has promulgated detailed rules governing the needs and well-being of the children in day care facilities.[6] Clearly, the government here is doing more than benefiting the general public and its immediate concern is for the children. Consistent with this concern for the children is the

---

simple way to stop a child from crying was to hold a towel over the child's mouth, or, if that failed, to put the child's head in the toilet and then flush it), it is not at all clear if Wedlund ever brought these instances of child abuse to the attention of the county. In her deposition, Wedlund says she told the county of the flushing, later that she probably told the county, and then that she does not remember telling the county of any abuse, only overcrowding. The only incident of abuse Wedlund remembers reporting was a child being tied to a hobby horse in the Ellefson backyard. This incident, however, allegedly occurred after the Aasen injury and only days before Ellefson's license was suspended.

**6.** Minn.R. § 9545.0090, for example, says day care providers must be "kind, mature, and re-

sponsible" because "[c]hildren who live apart from their own homes are uniquely in need of stable, understanding families."

Minn.R. § 9545.0380 provides, in part:
   B. No child shall be hit, shaken, pinched, or roughly handled by the FDC provider.
   C. No child shall be insulted or belittled by the FDC provider.
   *   *   *   *   *   *
   E. No child shall be punished for lapses in toilet training.

These rules, of course, are directed at the day care provider, not the county, but they do illustrate that the licensure scheme is uniquely aimed at the protection of a particular class rather than the public generally.

apparent practice of Anoka County to refer parents to those day care facilities which have been licensed on its recommendations.

■ 5. The fourth *Cracraft* factor is whether the municipality's activity has increased the risk of harm. This factor is not met. If Anoka County had discovered the alleged existing danger in the Ellefson home, it may be plaintiffs would not have been harmed, but that is a failure to decrease, not increase the risk of harm. Increasing the risk goes to whether a legal duty with tort sanctions should be imposed on the municipality; decreasing the risk goes to whether, assuming the legal duty exists, it was breached.

6. Of the four *Cracraft* factors, the first factor is arguably met partially, but the third factor—the statutory mandate to protect a certain class—is definitely met, and this third factor is so overwhelmingly dominant that we have no difficulty in finding a "special relation" exists between the county and the small children in the day care homes that it inspects for licensure. We hold, therefore, that Anoka County owes a special duty to plaintiffs.

The operation of child day care facilities apparently presents a high risk of liability exposure, and it can be argued that to impose this risk on government may discourage the government from assuming a protective role. On the other hand, the high risk underscores the need for adequate inspection. Here the legislature has addressed this problem. It has conferred governmental immunity on Anoka County under section 3.736, subd. 3 (1984). Liability exists here, however, because Anoka County has elected, as it may, to waive that immunity to the extent set out in its liability insurance.[7]

## III.

Finally, Anoka County argues that if it owes plaintiffs a special duty, any negligence on its part was not a proximate cause of plaintiffs' injuries as a matter of law. This argument is premature. The issues of causation are at best still obscure, in part because it is unclear how the two children were injured and in part because Anoka County's duty of care to the children as distinguished from Ellefson's duty of care to the children remains to be developed.

Affirmed in part and reversed in part.

WAHL, SCOTT and YETKA, JJ., concur specially.

WAHL, Justice (concurring specially).

I concur in the result reached by the majority opinion and with virtually all of its reasoning. I agree that Anoka County has a special relationship with children in county-licensed child care facilities, a relationship that creates a tort duty, and that the county has waived its governmental immunity in this case to the extent of its liability insurance coverage. I also agree that the issue of whether a special relationship exists is to be analyzed under *Cracraft* and that not all of *Cracraft's* enumerated factors need to be present for a special duty to be found to exist. Finally, I agree that the third *Cracraft* factor is present in this case—the Public Welfare Licensing Act creates a statutory duty for Anoka County to protect a particular class, i.e. small children in licensed child care facilities—and that the presence of this factor alone is sufficient in this case to create in the county a tort duty to the plaintiffs. I believe, however, that two other of the factors enumerated in *Cracraft* are also present here.

7. Under the 1986 Tort Reform Act, the Minnesota Legislature has further addressed this problem. Minn.Stat. § 466.03 has been amended to add a new exception to the waiver of governmental immunity for claims based on licenses issued by a municipality. *See* 1986 Minn.Laws ch. 455, § 69, effective July 1, 1986. *See also* a new section, Minn.Stat. § 466.132 (1986), relating to indemnification of a municipality when acting as an employee of the state.

In addition to these immunities, the legislature has attempted to make liability insurance available to day care providers through the creation of a joint underwriting association and, if need be, creation of a risk pool. 1986 Minn. Laws ch. 455, §§ 21 and 61.

Anoka County, in my view, had actual knowledge of a dangerous condition at the Ellefson home such that a special duty was imposed on them to do something about the condition. The county, through its inspectors and the reports of the next-door neighbor, knew of overcrowding in the Ellefson home in the period before Jerrett Aasen's injury. The Ellefson home was licensed for five children only. After Aasen was hurt, child protection workers found 13 pre-school age children, six of those children under 13 months of age, at the Ellefson home. For these 13 children there were only two caretakers, one mentally retarded. The two babies who were injured were seven months old. In the case of very young children in a child care situation, such overcrowding is per se dangerous.

Further, there is evidence that Jerrett Aasen's parents reasonably relied on Anoka County's licensing and supervision of the Ellefson home as a specific representation that this licensed home, as opposed to other nonlicensed homes, had met the standards for such facilities. The rules governing the licensing of family day care homes are detailed and comprehensive. They mandate, for example, required daily activities for children, training, supervision and personal and professional qualifications for care providers, health, safety and environmental conditions appropriate for young children, nutritional meals and health care for the children, etc. *See* Minn.Rules §§ 9545.0310–.0450 (1985). When a county licenses a child care facility, it represents to parents that these demanding standards have been met. This is not a general representation, but a representation that this specific licensee is a suitable person to have charge of children and that this particular facility provides adequate care and surroundings for young children. Parents, of course, may select a nonlicensed home because licensing of day care homes is not mandatory. Minn.Stat. § 245.791 (1984). Dennis Aasen's affidavit stated that he and Jerrett's mother would only place their child in a licensed home. Licensing standards are of critical importance to parents seeking adequate, nurturing child care and parents rely on enforcement of these rules. Parents who require child care have a special need to rely on the representation of quality indicated by licensing because, for a working parent, and most parents must work in today's world, child care is a necessity. There is no other source through which parents can get reliable information about this essential service than from the county, the licensing and inspection authority.

YETKA, Justice.

I join in the special concurrence of Justice Wahl.

SCOTT, Justice (concurring in the result only):

I agree with the result of the court's action in this case. The plaintiffs will now have an opportunity to prove that the county was negligent in supervising the Ellefson day care center. I disagree, however, with the avenue the court takes in reaching its result. I therefore write separately.

## I.

The court first determines that the county, by inspecting day care facilities for licensure, is an "employee of the state" and therefore immune under the state tort claims act, Minn.Stat. § 3.736, subd. 3 (1984). Such a holding is, I believe, the product of a contorted construction of the tort claims act.

In grappling with the complex issue of governmental tort liability, the state legislature enacted legislation covering claims filed against state government. It passed a separate act dealing with claims filed against local governments. The state tort claims act defines "state" as "the departments, boards, agencies, commissions and officers in the executive branch of the state of Minnesota." The law explicitly provides that the term does not include "a city, town, *county*, school district, or other local governmental body." Minn.Stat. § 3.732, subd. 1(1) (1984) (emphasis added). The tort liability of local government is dis-

cussed in the municipal tort liability act, Minn.Stat. § 466.01–.15 (1984). The statute states:

> For the purposes of sections 466.01 to 466.15, "municipality" means any city, whether organized under home rule charter or otherwise, *any county*, town, public authority, public corporation, special district, school district, however organized, county agricultural society organized pursuant to chapter 38, public library, regional public library system, multicounty multitype library system, or other political subdivision.

Minn.Stat. § 466.01, subd. 1 (1984) (emphasis added).

The legislature has drawn a distinct line between the tort liability of the state and the tort liability of local government. The court today blurs that distinction by holding that, in this case, the county was "acting on behalf of the state in an official capacity" and was therefore an "employee of the state."

In narrow situations and for specific purposes, the legislature has chosen to make a local governmental entity a "state employee." For example, the legislature recently enacted the following provision:

> Municipalities, when performing, as required or mandated by state law, inspections or investigations of persons prior to the issuance of state licenses, are employees of the state *for purposes of the indemnification provisions* of section 3.736, subdivision 9. A municipality is not, however, an employee of the state for purposes of this section if in hiring, supervising, or continuing to employ the person performing an inspection or investigation for the municipality, the municipality was clearly negligent.

Act of March 25, 1986, ch. 455, § 90, 1986 Minn.Laws 884 (codified at Minn.Stat. § 466.132) (emphasis added). The fact that the legislature made a county an employee of the state only for the purposes of the indemnification provisions of Minn.Stat. § 3.736, subd. 9, certainly implies that if it had desired to further expand the scope of state employees to cover the situation

presented in this case, it would have done so. This court should therefore decline to do what the legislature did not.

I would hold that the county, in this case, is not afforded the protection of the state tort claims act. The source of any protection must be the municipal tort liability act, Minn.Stat. § 466.01–.15, and that act provides no immunity to the county in this case.

## II.

Applying the principles of *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801 (Minn.1979), the court in this case determines that the county owed a "private" or "special duty" to the children enrolled in the day care facilities inspected by the county (as opposed to a duty merely to the general public). Because I believe *Cracraft* resurrects the sovereign immunity doctrine, a doctrine that this court laid to rest in *Spanel v. Mounds View School District No. 621*, 264 Minn. 279, 118 N.W.2d 795 (1962), and in *Neiting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975), I cannot concur in the court's analysis.

The outcome of this and other governmental liability cases should not rest on this court's determination that a certain governmental function either serves to protect the general public, thereby immunizing the governmental entity from liability, or serves to protect specific members of the public, thereby affording such privileged members the opportunity to prove that the government was negligent. When this court begins to so distinguish certain functions of government it treats the governmental defendant differently than the private defendant, who may actually be performing functions identical to those of the government. If a private firm was awarded a government contract to inspect day care facilities in a certain geographical region and this firm, whose profits were derived from such inspecting, allegedly failed to use reasonable care in carrying out those functions, this court would not seek to somehow determine whether the private firm was immune from liability based on

the nature of its business; rather, the court would apply traditional principles of tort law. The Restatement (Second) of Torts explicitly states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if * * * his failure to exercise reasonable care increases the risk of such harm * *.

Restatement, Torts 2d, § 324A. Is not the risk of injury increased by an inspector's failure to exercise reasonable care in undertaking the inspection service? This should be the focus of the court's inquiry in all such liability cases, whether or not the defendant is a governmental entity.

The court, instead, seeks to distinguish between a public and a private duty. If it finds only a public duty, as it did in *Cracraft* and *Hage v. Stade*, 304 N.W.2d 283 (Minn.1981), the governmental tortfeasor is off the liability hook, but if it finds a private or special duty, as in this case, a remedy exists for the wrong. To me, such a determination is a conclusion rather than an aid to analysis. It is, in effect, a policy determination rooted in principles of sovereign immunity. As Professor Prosser noted:

> The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself * * *.

W. Prosser, Law of Torts, 325 (4th ed. 1971).

I would abolish the public-private duty distinction and simply apply the tort principles enunciated in section 324A of the Restatement (Second) of Torts.[1]

YETKA, Justice.

I join in the special concurrence of Justice Scott.

---

1. Supreme Courts in other jurisdictions have recognized that the public-private duty distinction raises the spectre of the defunct sovereign immunity doctrine and have, accordingly, declined to adopt it. *See Stewart v. Schmieder,* 386 So.2d 1351 (La.1980); *Wilson v. Nepstad,* 282 N.W.2d 664 (Iowa 1979); *Adams v. State,* 555 P.2d 235 (Alaska 1976); *Coffey v. City of Milwaukee,* 74 Wis.2d 526, 247 N.W.2d 132 (1976).