Georgia HOPPE by Russell DYKEMA, her guardian, Respondent,

v.

KANDIYOHI COUNTY, defendant and third-party plaintiff, petitioner, Appellant,

v.

GREEN LAKE STATE BANK, third-party defendant, Respondent,

Paul Bengston, Third–Party Defendant.

No. C0–94–1627.

Supreme Court of Minnesota.

Feb. 16, 1996.

Michael J. Ford, Kenneth H. Bayliss, St. Cloud, for Appellant.

Dennis Helseth, David McLaughlin, Elbow Lake, for Respondent.

## OPINION

KEITH, Chief Justice.

Defendant Kandiyohi County obtained further review of a decision of the court of appeals construing Minn.Stat. § 626.557 (1994), the Vulnerable Adults Reporting Act, to allow a civil cause of action against the county for its alleged negligence in failing to timely investigate reports of abuse of a vulnerable adult or to intervene. *Hoppe v. Kandiyohi County,* No. C0–94–1627, 1995 WL 70167 (Minn.App. filed February 21, 1995). Because we conclude that the legislature did not explicitly or by clear implication establish that civil cause of action, we reverse the decision of the court of appeals and reinstate the summary judgment entered in favor of the county.

The parties have stipulated to the operative facts, and we summarize those which are relevant to this narrow appeal. On February 21, 1983, Georgia Hoppe executed a power of attorney appointing Paul Bengston, then an employee of the Green Lake State Bank where Hoppe was a depositor, as her attorney-in-fact. Bengston left the bank's employ in 1987. Bengston's involvement with Hoppe's financial affairs escalated in June, 1989 when Hoppe was hospitalized and then entered the Glen Oaks Nursing Home. From that date to November, 1990, Bengston wrote numerous checks on Hoppe's account, many of which named Bengston himself as payee, and later admitted that he forged Hoppe's signature on the drafts.

In March, 1990, Allen Struck, a State Bank employee, became suspicious about Hoppe's bank account activities and visited her on March 5, 1990 at the nursing home to inquire as to the disposition of the considerable account proceeds, to that date approximately $100,000. When Hoppe was reluctant to discuss the matter and announced her complete trust in Bengston, Struck then contacted Sondra Anderson, an intake employee of Kandiyohi County Family Services, and related his suspicions: that Hoppe was incompetent and residing in a nursing home; that Bengston had full power of attorney and Hoppe's full trust; and that over the preceding two or three years, Bengston had drawn funds in excess of $100,000 from Hoppe's account payable to himself.

In response and on that same day, Anderson contacted Chief Deputy Sheriff Roger Erickson, Department of Health Facilities social worker Carolee Carlson and Kandiyohi County Attorney Michael Lynch and explained the information provided by Struck. It was agreed, on Lynch's suggestion, that a mental health employee would conduct a competency evaluation of Hoppe and ascertain whether the funds had been loaned by Hoppe to Bengston or had been converted to his own use; upon completion of that process, family services or the county attorney would advise the sheriff if intervention was required. The planning continued with a meeting between Karen Mohlin, a Kandiyohi County social worker, and Lynch, on March 16, 1990, and again on March 20, 1990 with Mohlin, Lynch and, although there is some dispute, perhaps with Chief Deputy Erickson.

Despite that series of meetings, there was no interview with Hoppe and no further inquiry for over 6 months. During the period from March 5, 1990 to October 16, 1990, 19 checks made payable to Bengston and allegedly signed by Hoppe in the aggregate amount of $64,500 were drawn on Hoppe's account. Again, bank employee Struck contacted Anderson with information regarding the checking account, adding that Bengston was also cashing Hoppe's bonds and ultimately transferring the proceeds to his own account. Anderson contacted the sheriff's office.

On October 19, 1990, Mohlin and Dan Hartog, a county family services employee, interviewed Hoppe for the first time. Mohlin recommended on that date, based upon that interview, that immediate action was necessary to protect the Hoppe estate and that a guardianship petition should be filed. Hartog and Lynch met on October 20, 1990 and Lynch agreed to contact Mohlin to commence guardianship proceedings.

On November 28, 1990, a Vulnerable Adult Maltreatment report was prepared by County Family Services employees and a special guardian, Russell Dykema, was appointed on November 30, 1990. During the period from October 22, to November 28, 1990, eight additional checks were drawn in the total amount of $17,200, made payable to Bengston and allegedly signed by Hoppe.

The plaintiff commenced an action against Green Lake State Bank on June 5, 1992, alleging its negligence and breach of fiduciary duty. After settling that claim[1] in September, 1993, the plaintiff commenced this negligence action against Kandiyohi County.[2] Hoppe alleged that, as a result of the county's failure to perform its investigatory and intervention duties as required by the Minnesota Vulnerable Adults Reporting Act, more specifically, Minn.Stat. § 626.557, subd. 10(a) and (c), she sustained damages in the amount of $81,700, representing the amounts converted during the period from March 5, 1990 to November 28, 1990. On the parties' cross-motions, summary judgment was entered in favor of the county on the trial court's determination that Minn.Stat. § 626.557 does not authorize a civil action for alleged negligence in the county's performance of its investigatory and intervention responsibilities. On Hoppe's appeal,[3] the court of appeals reversed and remanded for further proceedings.

Minnesota Statutes section 626.557, the Vulnerable Adults Reporting Act, which details responsibilities relating to the reporting of the maltreatment of vulnerable adults, is one of several reporting statutes designed to identify those individuals charged with the responsibility of reporting suspected neglect or abuse of statutorily defined protected persons. *See* Minn.Stat. § 626.52–.563 (1994).[4] It declares that it is the public policy of this state "to protect adults who, because of physical or mental disability or dependency on institutional services, are particularly vulnerable to abuse or neglect * * *" and

> to require the reporting of suspected abuse or neglect of vulnerable adults, to provide for the voluntary reporting of abuse or neglect of vulnerable adults, to require the investigation of the reports, and to provide protective and counseling services in appropriate cases.

Minn.Stat. § 626.557, subd. 1 (1994).

There appears to be no dispute that by virtue of her age and physical and mental

---

1. Hoppe, through her guardian Dykema, entered into a "Loan Receipt and Contract for Release Agreement" and "Letter Agreement" with the bank, obtaining $60,000 in settlement proceeds designated as a "loan" in consideration for conditions not relevant here.

2. The County asserted third-party claims against the bank and Bengston, but the parties stipulated to a partial dismissal with prejudice, agreeing that any judgment against the county would be reduced by the percentage of fault attributed to the bank.

3. While her appeal was pending in the court of appeals, Hoppe died on October 8, 1994. In letters testamentary dated January 6, 1995, her guardian Russell Dykema was authorized to act as her personal representative and he continues this appeal. *See* Minn.Stat. § 573.01 (1992).

4. *See, e.g.,* Minn.Stat. § 626.556, commonly referred to as the Child Abuse Reporting Act; Minn.Stat. § 626.52, the Suspicious Wounds Reporting Act; Minn.Stat. § 626.5531, the Crimes Motivated by Bias Reporting Act.

condition and her residence in the nursing home, Hoppe is a "vulnerable adult" as defined by Minn.Stat. § 626.557, subd. 2(b), and that she was "abused" by Bengston's financial dealings within the meaning of subdivision 2(d)(4), or "neglected," as defined by subdivision 2(e)(3). In addition, it is agreed that information of suspected abuse was received by County Family Services on March 5, 1990; that the sheriff's department, the county attorney and the Department of Health were immediately notified; that despite planning the investigation, no investigation was conducted for a period of more than six months after the notification; that additional information of suspected continued abuse was received by family services on October 10, 1990 and that notification was again provided to county officials; that Hoppe was first interviewed on October 19, 1990; that a Report of Vulnerable Adult Maltreatment was prepared on November 28, 1990; and that a special guardian was appointed on November 30, 1990.

■ The narrow question we address is whether the alleged negligence of county employees in conducting the investigation or in delaying the investigation gives rise to civil liability under the reporting statute, section 626.557. We note that despite the mandate to agencies and individuals to both report suspected abuse or neglect and then to investigate those reports, the legislation itself only defines the consequences of a failure to report as mandated—a criminal penalty is imposed for an intentional failure and civil liability is imposed for both negligent and intentional failure. Minn.Stat. § 626.557, subd.7. Neither the investigation nor the intervention mandate identifies consequences for a failure to act on reports. *See,* Minn. Stat. § 626.557, subd. 10(a), (c).

In reversing the summary judgment entered in favor of the county, the court of appeals acknowledged that there was no express provision for imposing civil liability under the circumstances of record, but held, in application of this court's decision in *Andrade v. Ellefson,* 391 N.W.2d 836 (Minn. 1986), that a special relationship existed between the county and this vulnerable adult "giving ris[e] to a tort duty of care owed by the county to Hoppe." *Hoppe, supra,* slip op. at 12. *See also Cracraft v. City of St. Louis Park,* 279 N.W.2d 801 (Minn.1979).

In *Andrade,* two minor children sustained serious injuries while attending a daycare facility operated by the defendants Ellefson and inspected and supervised by Anoka County in assisting the Commissioner of Human Services in its licensing responsibility. 391 N.W.2d at 837. *See* Minn.Stat. § 245.804 (1984). We held that a special relationship existed between the county investigating daycare facilities for licensure and the small children who attended the facility, giving rise to a tort duty of care to the children who constitute a protected class under the *Cracraft* analysis. 391 N.W.2d at 842–43. Implicit in the holding was our recognition that the licensing procedure entails a detailed inspection and evaluation of an applicant facility and an ultimate determination of fitness to operate this service, *i.e.,* that the licensing requirements were adopted to "ensure a safe environment for children" in accordance with Minn.Stat. § 245.802, subd. 4 (1984), and our concern that the abuse of which the children complained occurred in the facility itself.

■ Here, unlike in *Andrade,* the legislature has spoken to the question of penalties or liability to be imposed with regard to the Vulnerable Adults Reporting Act and has not explicitly or by implication identified a civil cause of action for alleged negligent investigation or intervention. *See Larson v. Dunn,* 460 N.W.2d 39, 47 n. 4 (Minn.1990). We, accordingly, decline to impose potential civil liability for the alleged negligence here, relying upon our analysis in *Bruegger v. Faribault County Sheriff's Dep't,* 497 N.W.2d 260 (Minn.1993) (where there was no common law cause of action for failure to inform individuals of potential rights of recovery under the Crime Victims Reparations Act, Minn.Stat. § 611A.66 (1992), and where the legislature had not expressly or impliedly created a statutory cause of action, we held that no cause of action existed).

Reversed and summary judgment for Kandiyohi County reinstated.