**Matthew RADKE, as trustee for the next of kin of Makaio Lynn Radke, Appellant,**

v.

**COUNTY OF FREEBORN, et al., Respondents.**

**No. A03–797.**

Supreme Court of Minnesota.

April 21, 2005.

---

Stephen C. Feibiger, Burnsville, MN, for Appellant.

James Robert Anderson, Minneapolis, MN, for Respondent.

## OPINION

BLATZ, Chief Justice.

The issue in this case is whether a negligence cause of action can be maintained for the intervention and investigation of reports of suspected child abuse and neglect as required under the Child Abuse Reporting Act, Minn.Stat. § 626.556 (2004) (CARA). Appellant Matthew Radke (ap-

pellant), as trustee for the next of kin of his son Makaio Lynn Radke (Makaio), brought a wrongful death action against Freeborn County and two county child protection workers alleging that they negligently investigated reports of suspected abuse of Makaio. The district court granted respondents' motion to dismiss for failure to state a claim upon which relief can be granted under Minn. R. Civ. P. 12.02(e). The court of appeals affirmed, holding that the "legislature did not expressly or impliedly create a civil cause of action under the Child Abuse Reporting Act." *Radke v. County of Freeborn,* 676 N.W.2d 295, 301 (Minn.App.2004). We hold that a cause of action can be maintained for negligence in the investigation and intervention of child abuse and neglect reports as required under CARA. We therefore reverse and remand.

█ Nineteen-month-old Makaio was beaten to death on April 21, 2001 by Paul Gutierrez, a friend of his mother's. During the months preceding Makaio's tragic death, he was the subject of a child abuse and neglect investigation by the Freeborn County Department of Human Services.[1] At the time of his death, Makaio's parents had separated and were in the process of dissolving their marriage. In January 2001, appellant had moved out of the family's home and Makaio was living with his mother, Peggy Radke (Radke), and two other adults, Gutierrez and Kristina Baker. Upon learning that Gutierrez was living at the home, appellant become concerned and called the Albert Lea Police Department to make a complaint on January 20, 2001.

On February 28, 2001, appellant brought Makaio to the Albert Lea Medical Center where a doctor examined Makaio. Based on his examination of Makaio, which revealed that Makaio had lesions behind his ears and bruises on his cheeks, the doctor reported suspected child abuse and neglect to the Freeborn County Human Services Department. In response to that report, Tammy Ressler, a Freeborn County child protection worker, visited Radke's residence on March 2, 2001. Radke told Ressler that Makaio's injuries were caused by a fall. Ressler did no further investigation and took no protective action on behalf of Makaio.

On March 21, 2001, appellant brought Makaio to the Albert Lea Police Department after he discovered bruising on Makaio's testicles. The police reported the suspected abuse to the county the next day.[2] After the police took photographs, appellant again took Makaio to the Albert Lea Medical Center. The doctor who examined Makaio at the medical center noted Makaio's injuries which included abrasions on his head, a bruise on his jaw and his back, and wounds on his thigh and foot which resembled burns. Based on this examination of Makaio, the doctor also reported suspected abuse to the county.

In response to these reports, Ressler again visited Makaio at Radke's home on March 26, 2001. Radke told Ressler that the mark on Makaio's foot was caused by "hand-foot-and-mouth disease." Ressler apparently accepted this explanation, despite the fact that the doctor who examined Makaio diagnosed his injuries as resembling a burn. Although Ressler

1. Because this appeal arises in the context of a Rule 12.02(e) motion, all of the facts are taken from the complaint. *See Bodah v. Lakeville Motor Express, Inc.,* 663 N.W.2d 550, 553 (Minn.2003).

2. CARA requires that the "police department or the county sheriff, upon receiving a report * * * immediately notify the local welfare agency or agency responsible for assessing or investigating the report, orally and in writing." Minn.Stat. § 626.556, subd. 3(a).

observed Gutierrez present in the home and talked to him briefly, she did not question him about Makaio. No further investigation was conducted at that time, nor was any protective action undertaken.

Shortly thereafter, on April 10, 2001, appellant received a letter from Ressler advising him that the Freeborn County Department of Human Services had determined that no abuse had occurred and that child protective services were not necessary. The following day, appellant again contacted the Albert Lea Police Department to report his concern that Makaio was being abused. Two days later, Makaio's guardian ad litem also contacted the police after she visited the Radke home and observed that Makaio had some bruises on his face. The guardian ad litem took photographs of the bruising and reported to the police that Radke had claimed that the bruising occurred the night before while Makaio was in the bathtub.

It was not until April 20, 2001, seven days after the guardian ad litem reported suspected abuse to police and nine days after appellant's report, that the county took any steps to investigate. On that date, Lisa Frank, a second county child protection worker, visited Makaio at Radke's home at approximately 11:00 a.m. Present at the home during the visit were Radke, Makaio, Makaio's sister, Baker, and Baker's child. Frank was aware of the prior reports of abuse, and observed a small bruise on Makaio's left temple, a similar bruise on his rib cage, a third bruise on his backbone just above his diaper, and a healing injury to his foot. Frank also observed that Makaio was lethargic and had a runny nose. After a half-hour visit, Frank departed without instituting any precautionary measures and left Makaio with Radke at the home.

Later that day, Radke and Baker went out leaving Gutierrez in charge of Makaio, Makaio's sister, and Baker's child. Radke and Baker returned home at about 1:00 a.m. The next morning, Radke brought Makaio to the medical center where he was pronounced dead at 10:19 a.m. An autopsy conducted by the Ramsey County Medical Examiner determined that Makaio had died 10 to 12 hours before he was confirmed dead at the hospital. Makaio had multiple bruises on his face, back, legs, arms, lower extremities and head. Makaio also had multiple fractures of his ribs, sub-subcutaneous emphysema, a small abrasion on the back of his head, and a laceration on the edge of his rectum. Gutierrez was subsequently convicted of two counts of first-degree murder by criminal sexual conduct and by child abuse, and one count of second-degree murder. We affirmed his convictions. *State v. Gutierrez*, 667 N.W.2d 426 (Minn.2003).

Appellant was appointed trustee and next of kin of Makaio by order of the Freeborn County District Court on December 18, 2002. Shortly thereafter, appellant commenced this wrongful death negligence action against Freeborn County and the county's child protection workers Frank and Ressler, individually and in their capacities as employees of Freeborn County. Radke and Gutierrez were also named in the suit, but did not respond to the complaint and are not parties to this appeal.

Pursuant to Minn. R. Civ. P. 12.02(e), respondents Freeborn County, Frank, and Ressler moved to dismiss for failure to state a claim upon which relief can be granted. On June 2, 2003, the district court granted the respondents' motion to dismiss. The court of appeals affirmed the dismissal holding that "[t]he legislature did not expressly or impliedly create a civil cause of action" under CARA. *Radke*, 676

N.W.2d at 301. We granted review to answer the question of whether a cause of action exists for the wrongful death of a child allegedly caused by the negligent investigation of child abuse or neglect reports by the county and two county child protection workers.

 Review of a case dismissed for failure to state a claim upon which relief can be granted is limited to whether the complaint sets forth a legally sufficient claim for relief. *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn. 2003). An appellate court reviews the claim's legal sufficiency de novo and, in doing so, the facts of the complaint are accepted as true and all reasonable inferences are construed in favor of the non-moving party. *Id.* We will not uphold a Rule 12.02(e) dismissal "if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded." *N. States Power Co. v. Franklin*, 265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963).

Relying heavily on *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801 (Minn.1979), appellant argues that a special relationship existed between the county, its child protection workers, and Makaio because, under the factors established in that case, CARA created a special duty requiring respondents to act with due care in investigating reports of abuse. Appellant also relies on our decision in *Andrade v. Ellefson*, 391 N.W.2d 836 (Minn.1986), in which we applied the *Cracraft* factors and held that the county owed a special duty to children who were injured in a county-licensed home day care facility. Respondents, however, argue that no cause of action can be maintained under CARA as it is very similar to the Vulnerable Adults Reporting Act, Minn.Stat. § 626.557 (2004) (VARA), the statute at issue in *Hoppe v. Kandiyohi County*, 543 N.W.2d 635 (Minn.

1996), where we held that no cause of action could be maintained under VARA.

 Generally, a person has no common law duty to prevent a third person from injuring another unless there is some kind of special relationship. *Andrade,* 391 N.W.2d at 841; Restatement (Second) of Torts § 315 (1965). Applying this principle to governmental torts in what is called the "public duty rule" requires that a governmental unit owe the plaintiff a duty different from that owed to the general public in order for the governmental unit to be found liable. *Cracraft,* 279 N.W.2d at 806. In other words, a purely "public duty"—as opposed to a "special duty"—cannot give rise to government tort liability. *Id.* Our decision in *Cracraft* set out the test for determining whether a special duty exists. *Id.* at 806–07. Under *Cracraft,* the existence of a statute or ordinance is not sufficient to create a special duty; instead, a special duty of care arises only when "there are additional indicia that the [governmental unit] has undertaken the responsibility of not only protecting itself, but also undertaken the responsibility of protecting a particular class of persons" from the risks associated with a particular harm. *Id.* at 806.

The issue before the court in *Cracraft* was whether a special duty existed on the part of the city under its fire code ordinance. *Id.* at 803. In *Cracraft,* two children died and one child was injured when a 55–gallon drum of duplicating fluid ignited on the loading dock of a high school. *Id.* The suit against the city brought on behalf of two of the children by their parents alleged negligence because of the failure of a city fire inspector to discover the drum on the loading dock—a violation of the city's fire ordinance—at the high school during an inspection conducted a few weeks earlier. *Id.* at 802.

In determining whether a special duty existed in *Cracraft*, we listed four factors to be considered:

(1) Whether the governmental unit had actual knowledge of the dangerous condition;

(2) Whether there was reasonable reliance by persons on the governmental unit's representations and conduct (such reliance must be based on specific actions or representations which cause the persons to forego other alternatives of protecting themselves);

(3) Whether an ordinance or statute set forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole; and

(4) Whether the governmental unit used due care to avoid increasing the risk of harm.

*Id.* at 806–07. In setting out the four factors, we were careful to note that the factors were not exhaustive and that we were not creating a "bright line test." *Id.* at 806. After analyzing the facts of the case within this framework, we concluded that none of the four factors were present in *Cracraft* and thus refused "to impose a duty of care merely because an inspection is undertaken." *Id.* at 808.

Subsequently in *Andrade v. Ellefson*, we applied the same four-factor test and held that the county had a special duty of care to the children injured in the county-licensed home day care facility. 391 N.W.2d at 843. The underlying statute at issue in *Andrade* was the Public Welfare Licensing Act, Minn.Stat. §§ 245.781–245.812, 252.28, subd. 2 (1984) (PWLA). The PWLA required that certain day care facilities obtain annual licenses and, as part of the licensing process, the county sent inspectors to the applicant's facility. *Andrade*, 391 N.W.2d

at 838. Additionally, in response to complaints of overcrowding, the county conducted two unannounced inspections of the day care facility. *Id.* During one of the unannounced inspections, the county inspector found more than the maximum number of children in the facility than the license allowed. *Id.* The county inspector nevertheless continued to recommend approval of the license. *Id.* at 838–39. Two children were eventually injured at the day care facility—one child sustained a skull fracture and developed epilepsy and the other child sustained a subarachnoid hemorrhage, an injury consistent with a violent fall or shaking, and an arm fracture. *Id.* at 837.

The injured children and their parents filed suit against the county for negligence in supervising, inspecting, and recommending relicensing of the day care facility where the children were injured. *Id.* On appeal from the trial court's grant of summary judgment for the county, we applied the *Cracraft* factors and concluded that the county owed a special duty to the children in the county-licensed day care facility. *Andrade*, 391 N.W.2d at 841–43. In doing so, we concluded that the first factor—actual knowledge of a dangerous condition—was "arguably met partially" because there was "some evidence that the county had actual knowledge of overcrowding." *Id.* at 841–43. We then concluded that the second and fourth factors—reasonable reliance and increasing the risk of harm, respectively—were not met. *Id.* at 842–43. However, we concluded that the third factor—that the ordinance or statute set forth mandatory acts for the protection of a particular class of persons—was "so overwhelmingly dominant" that we had "no difficulty" in finding a "special relation" existed between the county and the children in the home day care facilities it inspected for licensure. *Id.* at 843. We then held that the county owed a special

duty to the injured children, emphasizing that "the [Public Welfare Licensing] Act clearly mandates that small children in a licensed day care facility are a particular protected class" and that the class consisted of "uniquely vulnerable persons." *Id.* at 842. Thus, the statute was "doing more than benefiting the general public * * * as its immediate concern is for the children." *Id.* at 842.

Ten years later, in *Hoppe v. Kandiyohi County* we were presented with the question of whether VARA, could form the basis for a civil cause of action in negligence. 543 N.W.2d at 635. In *Hoppe,* the guardian of an elderly woman brought an action against Kandiyohi County for its negligent investigation and intervention after the county received reports of financial abuse of Hoppe by Paul Bengston, a former bank employee with power of attorney. *Id.* at 637. The county waited six months after the initial report of suspected abuse was filed before interviewing Hoppe and determining her competency. *Id.* In the meantime, Bengston continued writing checks to himself from Hoppe's account. *Id.* Hoppe's guardian sued, alleging that as a result of the county's failure to perform its investigatory and intervention duties as required by VARA, Hoppe sustained monetary damages for the amounts converted from her bank account. *Id.*

In *Hoppe,* without directly applying the *Cracraft* factors, we distinguished *Andrade* by stating:

Implicit in [our holding in *Andrade*] was our recognition that the licensing procedure entails a detailed inspection and evaluation of an applicant facility and an ultimate determination of fitness to operate this service, *i.e.,* that the licensing requirements were adopted to "ensure a safe environment for children" in accordance with Minn.Stat. § 245.802, subd. 4 (1984), and our concern that the abuse of which the children complained occurred in the facility itself.

*Hoppe,* 543 N.W.2d at 638. We then concluded that no cause of action could be maintained because the legislature did not "explicitly or by implication identif[y] a civil cause of action for alleged negligent investigation or intervention" in VARA. *Id.*

In the instant case, the court of appeals acknowledged that the "law is not clear cut," but concluded that, given the similarity between CARA and VARA and our holding in *Hoppe* that no cause of action could be maintained under VARA, no cause of action could be maintained under CARA.[3] *Radke,* 676 N.W.2d at 300. The statutes at issue in *Hoppe* and in the present case, VARA and CARA respectively, while not identical, are similar. *Compare* Minn.Stat. § 626.557 (2004) *with* Minn. Stat. § 626.556 (2004). Here, however, we also have considerations which closely resemble the considerations we relied on in *Andrade* when we found a cause of action

3. While not central to its holding, the court of appeals attempted to reconcile *Andrade* and *Hoppe* by applying immunity law and stating that "it appears that the Minnesota Supreme Court in *Andrade* looked at the day care checklist as ministerial"—i.e., no immunity—"but in *Hoppe* found the decision-making to be discretionary"—i.e., the county was immune. *Radke,* 676 N.W.2d at 300. This distinction is incorrect as we in *Andrade* stated that the county was immune, but that the county had waived immunity. 391 N.W.2d at

843. Further, the distinction noted by the court of appeals relates to the question of governmental immunity and not the existence of a special duty. Although immunity may be a relevant factor in determining whether appellant can ultimately recover, it is not currently before us. If anything, the grant of immunity under the statute for actions done in "good faith," *see* Minn.Stat. § 626.556, subd. 4, suggests that the subject of the statute had a duty to act in the first place.

did exist. *See Andrade,* 391 N.W.2d at 843. For example, like the licensing statute at issue in *Andrade,* CARA was adopted to ensure a safe environment for children. Moreover, as was the case in *Andrade,* the abuse complained of in the current case occurred in a home that was the subject of the investigation by the county. Therefore, insofar as we relied on these distinctions between *Hoppe* and *Andrade* in concluding that there was no cause of action in *Hoppe,* the same reasoning does not distinguish *Andrade* from the present case. Further, the question of whether a statute creates a special duty is answered on a case-by-case basis by applying the *Cracraft* factors to the facts of the case. *See Cracraft,* 279 N.W.2d at 807 (stating "[a]pplying these factors to this case, we find no evidence in the record indicating that a duty was assumed or a special duty was created."); *Andrade,* 391 N.W.2d at 841.

Given this background and our precedent, we turn then to applying the *Cracraft* factors to discern if the county owed a special duty under CARA. We first note that three of the *Cracraft* factors require an analysis of the facts of the case: whether the county had actual knowledge of the dangerous condition (factor one); whether there was reasonable reliance on the county's representation (factor two); and whether the county increased the risk of harm (factor four). To the extent that the *Cracraft* analysis relies on the particular facts of the case, our analysis in this appeal from a 12.02(e) dismissal is limited to the facts set forth in the complaint. *See Bodah,* 663 N.W.2d at 553. In contrast, factor three—mandatory acts for the protection of a particular class-involves an analysis of the statute alone. Thus, we will begin our discussion with this factor.

■ The third factor used to determine if a special duty exists is whether the statute sets forth mandatory acts that are for the protection of a particular class of persons and not the public in general. CARA requires that certain persons, including medical professionals, clergy, and law enforcement personnel, who know or have reason to believe that child abuse or neglect is occurring, report such information immediately. Minn.Stat. § 626.556, subd. 3(a). The statute also facilitates voluntary reporting from any other person suspecting child abuse or neglect. *Id.* at subd. 3(b). Reports made under CARA must be specific and contain "sufficient content to identify the child, any person believed to be responsible for the abuse or neglect of the child if the person is known, the nature and extent of the abuse or neglect and the name and address of the reporter." *Id.* at subd. 7.

Once a report is received, CARA mandates that the proper authority investigate the report. *Id.* at subd. 10(a). According to the statute, when the local welfare agency receives a report, "the local welfare agency *shall* immediately conduct an assessment * * * and offer protective social services for purposes of preventing further abuses, safeguarding and enhancing the welfare of the abused or neglected minor, and preserving family life whenever possible." *Id.* (emphasis added). The statute further provides: "When necessary the local welfare agency *shall* seek authority to remove the child from the custody of a parent, guardian, or adult with whom the child is living" and the "local welfare agency *shall* collect available and relevant information to ascertain whether maltreatment occurred and whether protective services are needed." *Id.* at subd. 10(a), (h) (emphasis added). In addition, the statute states that "[e]ach agency *shall* prepare a separate report of the results of its investigation." *Id.* at subd. 10(a) (emphasis added).

The statute clearly and repeatedly requires the performance of mandatory acts. These mandatory acts prescribed by the statute are for the protection of a particular class of persons—children who are identified as abused or neglected. In fact, the express public policy set forth in the statute is "to protect children whose health or welfare may be jeopardized through physical abuse, neglect, or sexual abuse." *Id.* at subd. 1. The statute further emphasizes that

> it is the policy of this state to require the reporting of neglect, physical or sexual abuse of children in the home, school, and community settings; to provide for the voluntary reporting of abuse or neglect of children; to require the assessment and investigation of the reports; and to provide protective and counseling services in appropriate cases.

*Id.* Based on these declared public policy goals, we conclude that the acts mandated in CARA are not for the protection of the public or even children in general, but are mandated for the protection of a particular class of persons—children who are identified in suspected abuse or neglect reports received by the county.[4] Like the class of persons in *Andrade*, the children protected by CARA are "uniquely vulnerable persons." These children have been identified by suspected child abuse or neglect reports. They are especially vulnerable because they are alleged to have suffered abuse or neglect in the privacy of their homes, often at the hands of a parent or other family member, and cannot protect themselves. Therefore, we hold that the third factor clearly is met in this case.

As noted above, we have only the facts in the complaint before us and are thus limited in our analysis of the remaining *Cracraft* factors. We accept those facts as true and draw all reasonable inferences in favor of the nonmoving party—here, appellant. *See Bodah,* 663 N.W.2d at 553. Within this constricted framework, we offer the following observations regarding the remaining *Cracraft* factors.

■ The first *Cracraft* factor requires that the county have actual knowledge of the dangerous condition. *Cracraft,* 279 N.W.2d at 806. According to the complaint, the county received numerous reports of suspected abuse of Makaio from appellant, the police, doctors, and Makaio's guardian ad litem. Accordingly, because we draw all reasonable inferences in favor of the nonmoving party on appeal from a motion to dismiss, actual knowledge on the part of the county is established.

■ The second *Cracraft* factor requires reasonable reliance on the county's representations and conduct. *Cracraft,* 279 N.W.2d at 806–07. Such reliance must be based on specific actions or representations which cause the person to forego other alternatives of protection. *Id.* at

4. Other courts considering the issue of whether a child protection statute creates a public duty or special duty have also concluded that such statutes are intended to protect a specific class of children, i.e. those suspected of suffering abuse or neglect. *See, e.g., Horridge v. St. Mary's County Dep't of Soc. Servs.,* 382 Md. 170, 854 A.2d 1232, 1244 (2004) ("Clearly, the essential purpose of the statutory duties created by [the Maryland child abuse prevention statute] and the implementing regulations of the Department of Human Resources was to protect a specific class of children * * *."); *Brodie v. Summit County Children Servs. Bd.,* 51 Ohio St.3d 112, 554 N.E.2d 1301, 1308 (1990) ("[T]he action required by the statute is not directed at or designed to protect the public at large, but intended to protect a specific child who is reported as abused or neglected."); *Mammo v. State,* 138 Ariz. 528, 675 P.2d 1347, 1351 (Ct.App.1983) (concluding that the Arizona child protection statute "is quite specific and sets forth duties on the part of protective services workers which are clearly for the protection of threatened individuals").

807. Given the limited facts before us, we cannot conclusively say whether this factor is met. However, given the repeated reports to the county detailed in the complaint, we find it difficult to speculate as to what more appellant could have done.

Finally, the fourth *Cracraft* factor requires an analysis of whether the county has increased the risk of harm. The limited facts before us suggest that this factor is not established. Such a conclusion is not a bar, however, from this case going forward. As we clearly stated in *Andrade*, all four factors need not necessarily be met for a special duty to exist. 391 N.W.2d at 841; *see also Cracraft*, 279 N.W.2d at 806 (noting that the factors listed do not create a "bright line" test and are not exhaustive). Here, the third factor is "overwhelmingly dominant." *See Andrade*, 391 N.W.2d at 843 (stating "this third factor is so overwhelmingly dominant that we have no difficulty in finding a 'special relation' exists between the county and the small children in the day care homes that it inspects for licensure."). Accordingly, we hold that based on the application of the *Cracraft* factors to the facts of this case, respondents owed a special duty to Makaio once they received reports identifying him as a suspected victim of abuse.

Our holding embraces the reasoning set forth in *Cracraft* and *Andrade* and conforms with the majority of other jurisdictions recognizing a duty on the part of social service agencies to investigate reports of child abuse and neglect.[5] From the clear language of CARA, it is manifest that the legislature intended to provide safety and protection for children in abusive and neglectful situations and for the county social services department and its child protection workers to act immediately when they receive specific reports of abuse or neglect. *See* Minn.Stat. § 626.556, subd. 10(a) ("[T]he local welfare agency shall immediately conduct an assessment * * *."). Given this express intent, it is incongruous to conclude that the legislature intended to impose criminal penalties on those persons who fail to report as mandated under the statute, but intended that there be no *duty* on the part of the county welfare department or its employees to investigate or act on the reports. *See* Minn.Stat. § 626.556, subd. 6 (providing for misdemeanor, gross misdemeanor, or felony sanctions for failure to report under the statute). We believe that the statute, taken as a whole, leads to the inescapable conclusion that respondent county and its employees had a duty to act.[6] This conclusion is further supported by CARA's statutory provision granting immunity to "person[s] with responsibility for performing duties" under the statute *if* the person is "acting in good faith and

---

**5.** *See Mammo*, 675 P.2d at 1350–51; *Dep't of Health and Rehab. Servs. v. Yamuni*, 529 So.2d 258, 261–62 (Fla.1988); *Horridge*, 854 A.2d at 1238–40; *Brodie*, 554 N.E.2d at 1308–09; *Jensen v. Anderson County Dep't of Soc. Servs.*, 304 S.C. 195, 403 S.E.2d 615, 619 (1991); *Owens v. Garfield*, 784 P.2d 1187, 1191–92 (Utah 1989); *Sabia v. State*, 164 Vt. 293, 669 A.2d 1187, 1191–92 (1995); *Yonker v. Wash.*, 85 Wash.App. 71, 930 P.2d 958, 963 (1997); *see also* Susan Abbott, Note, *Liability of the State and its Employees for the Negligent Investigation of Child Abuse Reports*, 10 Alaska L. Rev. 401 (1993); Jason This, Casenote, *Brodie v. Summit County Children Services Board: A Statutory Duty Exception to the Public Duty Rule for Children Service Agencies*, 17 Ohio N.U. L. Rev. 711 (1991).

**6.** We are aware that this case is currently before us on a Rule 12.02(e) motion to dismiss, that discovery will continue on remand, and that the county and its employees may raise defenses of immunity. Nonetheless, as pleaded, we have significant concerns about the actions of the county and its employees and whether they protected the child as required under the statute.

exercising due care." *See* Minn.Stat. § 626.556, subd. 4(b). This language suggests that the subject of the statute had a duty to act.

We recognize that our holding here overrules our decision in *Hoppe*. Nonetheless, given the vitality of *Cracraft* and *Andrade*, the facts of this case have made it clear that it is impossible to harmonize *Hoppe* with *Cracraft* and *Andrade*; therefore *Hoppe* cannot stand. To decide otherwise would eviscerate the legal principles regarding special duties set forth in *Cracraft* and *Andrade*.

Accordingly, we hold that a cause of action can be maintained for negligence in the investigation of child abuse and neglect reports as required under CARA. The court of appeals' decision affirming the dismissal of appellant's complaint is reversed and the case is remanded to the district court for further proceedings in accordance with this opinion.

Reversed and remanded.