Nancy BECKER and Michael Becker, individually and as parents and guardians for Nykkole E. Becker f/k/a Nykkole E. Rossini, Appellants,

Minnesota Department of Human Services, Plaintiff Intervenor, Appellant,

v.

MAYO FOUNDATION, Respondent.

No. A05–45.

Supreme Court of Minnesota.

Aug. 16, 2007.

Chris A. Messerly, Laura M. Provinzino, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, for Appellants and State of Minnesota.

Paul B. Klaas, Gillian Brennan, Dorsey & Whitney LLP, Ann E. Decker, Fredrickson & Byron, Minneapolis, MN, for Respondent.

Gail Chang Bohr, Children's Law Center of Minnesota, St. Paul, MN, Mary R. Vasaly, Mason, Edelman, Borman & Brand, L.L.P., Minneapolis, MN, for Amicus Curiae Children's Law Center of Minnesota.

Elizabeth Melton, Ani Backa Hartzheim, Foley & Mansfield PLLP, Minneapolis, MN, for Amicus Curiae Prevent Child Abuse Minnesota.

Karen J. Kingsley, Kingsley Law Office, P.A., St. Paul, MN, for Amicus Curiae Minnesota Trial Lawyers Association.

Michael G. Finnegan, Jeff Anderson & Associates, P.A., St. Paul, MN, for Amicus Curiae Survivors Network Minnesota.

Mark. R. Whitemore, Charles E. Lundberg, Susan E. Gustad, Bassford Remele, Minneapolis, MN, for Amicus Curiae Minnesota Hospital Association; Minnesota Medical Association; American Medical Association; Minnesota Orthopaedic Association; American Association of Orthopaedic Surgeons; American College of Emergency Physicians; and American Academy of Pediatrics, Minnesota Chapter.

Louise Dovre Bjorkman, Paula Duggan Vraa, Carrie A. Daniel, Larson King, L.L.P., St. Paul, MN, for Amicus Curiae Minnesota Defense Lawyers Association.

John Michael Jerabek, Niemi, Barr & Jerabek, P.A., Minneapolis, MN, for Amicus Curiae.

OPINION

ANDERSON, PAUL H., Justice.

The adoptive parents of a child abused by her biological father sued the hospital that treated the child. The parents alleged that the hospital's physicians failed to prevent ongoing abuse. The district court granted the hospital's motion to strike three counts in the parents' complaint and ruled that the parents could not introduce evidence of the hospital's failure to report suspected child abuse to outside authorities. A jury then determined that the hospital was negligent but that this negligence was not a direct cause of the child's injuries. The parents appealed, arguing that a cause of action exists under the Child Abuse Reporting Act, Minn.Stat. § 626.556, and at common law for failure to report suspected abuse. The court of appeals affirmed the district court. We affirm in part, reverse in part, and remand.

Nykkole Becker, formerly known as Nykkole Rossini, is the adopted daughter of appellants Nancy Becker and Michael Becker. Nykkole, who is now ten-years-old, suffers from severe, permanent disabilities as a result of physical abuse by her biological father. Her biological parents are Brian Rossini and Sabryna Koob.

Nykkole was born on July 26, 1997 at Methodist Hospital in Rochester, Minnesota. At birth she was a healthy child. On August 17, 1997, when she was 22 days old, her biological parents brought her to the emergency room at Saint Mary's Hospital in Rochester, a hospital owned by respondent Mayo Foundation. When Nykkole was brought to the hospital she had bruises on her left forearm. Following an examination and x-rays, hospital staff diagnosed Nykkole as having a spiral fracture

to the left humerus. The humerus is the long bone in the upper arm and a spiral fracture is one that goes around the bone. Medical staff at Saint Mary's questioned both parents about the injury to Nykkole and how it occurred. Brian Rossini told the medical staff that the fracture occurred as the result of an accident. He said that he was feeding Nykkole while holding her in his arms and that as he stood to reach for a bottle she "spasmed" and began to roll out of arms. He stated that as Nykkole fell, he grabbed her left arm to keep her from hitting the floor.

Dr. Gregory Alberton applied a splint to Nykkole's left arm and gave her parents a date for a follow up appointment. Dr. Alberton and other medical staff members who had seen Nykkole on August 17 were questioned extensively at trial about the decision to send Nykkole home with her parents that day. Dr. Julia Rosekrans stated that she questioned Nykkole's parents about the injury. Because the humerus is the most commonly fractured bone in child abuse cases and this type of injury is uncommon in infants, Dr. Rosekrans indicated that she initially suspected child abuse. As a result of this suspicion, Dr. Rosekrans, Dr. Alberton, and Dr. Sarah Brandt, a pediatric resident, all questioned Nykkole's parents about the injury.

Dr. Rosekrans stated that after questioning Rossini, she and other staff members believed his story because the accident he described would cause the precise type of injury Nykkole suffered and because he told the story consistently to Dr. Alberton and Dr. Brandt and told it in an unrehearsed manner. Dr. Rosekrans stated that based on her experience, when abusive parents describe injuries to their children their stories tend to change with each retelling. Dr. Rosekrans acknowledged that she did not interview Nykkole's parents separately and that she and the other staff members did not corroborate Rossini's story with additional sources. After consulting with each other, the physicians concluded that the injuries to Nykkole were not caused by abuse, and they released her to her parent's care.

On September 3, Nykkole returned to the hospital for a follow-up treatment for the fracture to her left arm. At this time, hospital staff who treated Nykkole determined that the fracture was healing and that no further treatment was necessary.

On September 11, 1997 Nykkole was again brought to Saint Mary's emergency room by her mother Sabryna Koob. Koob told the medical staff who attended to Nykkole that she was concerned because Nykkole had vomited at least ten times that day and was "sleeping a lot." Koob stated that Nykkole had no other symptoms. Dr. Rosekrans again examined Nykkole, spending almost an hour performing a full physical examination and feeding Nykkole water and infant formula. Dr. Rosekrans stated that she observed no other symptoms and—after concluding that Nykkole had a stomach bug—sent her home with her mother.

Four days later, on September 15, 1997, Koob again brought Nykkole to Saint Mary's emergency room. Nykkole was pale, listless, "acting spacey," smacking her lips, and jerking her left arm and leg. She also had a yellow/green bruise on her head and a swollen fontanelle.[1] Radiological testing revealed that Nykkole had multiple skull fractures, multiple rib fractures, and fractures to both legs. She was also diagnosed as suffering from bleeding in

---

1. The fontanelle is the soft spot on the top of a baby's head. A swollen fontanelle is a sign of brain damage.

the brain and brain infarctions.[2] The amount of healing to some of the rib fractures made it apparent that the fractures predated the September 11 emergency room visit. Koob asserted that Nykkole hit her head on the bathtub, but Nykkole's treating physicians found this explanation implausible. Nykkole was admitted to the intensive care unit with a diagnosis of Shaken Baby Syndrome.

Following Nykkole's hospitalization and treatment, the state took custody of Nykkole and placed her in foster care with petitioners Nancy and Michael Becker. Rossini was arrested, charged, tried, and convicted of first- and third-degree assault for injuring Nykkole. The district court sentenced Rossini to 180 months in prison. At Rossini's trial, Koob admitted that she made up the story about Nykkole hitting her head on the bathtub because she feared she would lose custody of Nykkole. Koob pleaded guilty to child endangerment. Rossini and Koob each had their parental rights terminated and were ordered jointly to pay the Beckers $58,685 in restitution. The Beckers subsequently adopted Nykkole.

Nykkole, who is now ten-years-old, will never function above the level of an infant. She cannot walk, talk, sit up, or feed or dress herself. Her life expectancy has been significantly reduced as a result of her injuries, and as long as she lives she will require 24–hour medical care and special medical equipment. It is undisputed that Nykkole's disabilities resulted from the injuries discovered and diagnosed on September 15, 1997.

In 2001, the Beckers sued Mayo,[3] alleging that negligence on the part of Nykkole's treating physicians caused her injuries. The Beckers alleged that Mayo's negligence included:

(a) failure to adequately assess and document injuries associated with intentionally afflicted trauma;

(b) failure to recognize and treat signs and symptoms of head trauma in an infant with a history of suspicious traumatic injury;

(c) failure as a mandatory reporter to report suspected child abuse;

(d) failure to have in place hospital policies requiring hospital personnel to comply with mandatory reporting requirements;

(e) failure to monitor activities of hospital staff to assure compliance with reporting of suspected child abuse.

Mayo moved to strike allegations (c), (d), and (e) on the grounds that there is no private civil cause of action for failure to report suspected child abuse. The Beckers opposed the motion, relying on cases from other jurisdictions, expert testimony, and journal articles to argue that a physician's standard of care includes diagnosing and reporting abuse to outside authorities, and this standard in turn creates a common law duty on the part of the physician to report the suspected abuse to the proper authorities. The district court granted Mayo's motion to strike, relying on the conclusion of the Minnesota Court of Appeals in *Valtakis v. Putnam,* 504 N.W.2d 264, 266 (Minn.App.1993), that the Minnesota Child Abuse Reporting Act ("CARA"), Minn.Stat. § 626.556, created a statutory duty to report suspected abuse but did not create a civil cause of action for failure to

---

**2.** Brain infarctions are regions of dead or dying tissue which are the result of a sudden obstruction to the blood circulation supplying the involved part of the body. Schmidt's Attorneys' Dictionary of Medicine I–30 (1981).

**3.** The Minnesota Department of Human Services, along with the Beckers, seeks recovery of medical and other expenses associated with Nykkole's treatment and care.

do so. Subsequently, the district court granted Mayo's motion in limine to exclude all evidence related to Mayo's reporting of child abuse to outside authorities.

In a petition for discretionary review to the court of appeals, the Beckers challenged the district court's order to strike their allegations. The court of appeals denied review, and the district court then prevented the Beckers from presenting any evidence at trial of Mayo's failure to report suspected abuse of Nykkole to outside authorities. The district court did allow the Beckers to present evidence regarding services available to Mayo's physicians, including social, family, or psychological services that could have assisted in diagnosing and treating Nykkole.

After a two-week trial, a jury found that Mayo had been negligent but that its negligence was not a direct cause of Nykkole's injuries. The Beckers moved for a new trial, asserting that they were deprived of a fair trial and that the jury's verdict was not supported by the evidence. The district court denied the motion, concluding again that there was no common law cause of action for failure to report child abuse in Minnesota and that the verdict was reasonable. In denying the Beckers' motion, the court acknowledged Mayo's argument that the Beckers' offer of proof of what child protection agents would have done if contacted about suspected abuse to Nykkole was insufficient to warrant a new trial. The court noted that this argument had some merit, as the Beckers never offered to call a child protection worker as part of their offer of proof. But the court concluded that the Beckers had nevertheless made their theory of liability "abundantly clear" and therefore the court stated that it was not denying the motion based on the insufficiency of the Beckers' offer of proof.

The Beckers sought review by the court of appeals, arguing that (1) the district court's erroneous exclusion of reporting-related evidence effectively abolished their common law claim that Mayo breached its duty to report Nykkole's abuse; (2) Mayo's physicians had a special relationship with Nykkole and thus a common law duty to protect Nykkole from the criminal conduct of her father; and (3) the jury's causation verdict was based solely on errors of law at trial. *Becker v. Mayo*, No. A05–45, 2005 WL 3527163, at *1 (Minn. App. Dec.27, 2005).

On April 21, 2005, after the parties had filed their principal briefs with the court of appeals but before the Beckers filed their reply brief, we issued our decision in *Radke v. County of Freeborn*, 694 N.W.2d 788 (Minn.2005). In *Radke*, we held that a cause of action exists for "negligence in the investigation of child abuse and neglect reports as required under CARA [the Child Abuse Reporting Act]." 694 N.W.2d at 799. In their reply brief, the Beckers argued that the *Radke* decision "topples the foundation upon which the district court struck" their negligence allegations and excluded reporting evidence at trial.

Following oral argument, the court of appeals, in an unpublished decision, affirmed the district court's denial of the Beckers' motion for a new trial. *Becker*, 2005 WL 3527163, at *6. The court first noted that our decision in *Radke* recognized civil liability for failure to *investigate* abuse after it has been reported, not for failure to *report* suspected abuse. *Id.* at *3–4. The court concluded that the cases from other jurisdictions, expert testimony, and journal articles cited by the Beckers were unpersuasive and held that there is no common law cause of action in Minnesota for failure to report suspected child abuse. *Id.* at *4. The court also concluded that Mayo had no "special relationship"

with Nykkole that would give rise to a duty to report. *Id.* at *4–5. Finally, the court held that, while reporting-related evidence would have been admissible at trial, its exclusion did not prejudice the Beckers' ability to establish causation because they were still able to present testimony regarding Mayo's own resources that might have prevented Nykkole's injuries. *Id.* at *5–6.

We granted the Beckers' petition for review of three issues: (1) whether CARA creates a cause of action for failure to report suspected child abuse; (2) whether a hospital that accepts responsibility for treating a child owes that child a special duty to protect her from future harm; and (3) whether there is a common law cause of action for failure to report suspected child abuse in Minnesota.

## I.

Although CARA does not expressly create a cause of action for failure to report suspected child abuse, the Beckers argue that our holding in *Radke* compels us to recognize such a cause of action. They also argue that CARA's policy of preventing abuse, CARA's civil immunity provision, and the lack of actual prosecutions for failure to report weigh in favor of recognizing civil liability. Mayo asserts that the vast majority of other states' reporting acts impose criminal, not civil, liability for failure to report, and that courts

in those states have rejected efforts to impose civil liability by implication.

### A. CARA

■■■ Construction of a statute is a legal question that we review de novo. *Lewis–Miller v. Ross,* 710 N.W.2d 565, 568 (Minn.2006). A statute does not give rise to a civil cause of action unless the language of the statute is explicit or it can be determined by clear implication. *Larson v. Dunn,* 460 N.W.2d 39, 47 n. 4 (Minn. 1990).[4] "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). "Principles of judicial restraint preclude us from creating a new statutory cause of action that does not exist at common law where the legislature has not either by the statute's express terms or by implication provided for civil tort liability." *Bruegger v. Faribault County Sheriff's Dep't,* 497 N.W.2d 260, 262 (Minn.1993) (holding that the Crime Victims Reparations Act does not create a private cause of action against law enforcement agencies that fail to inform crime victims of their right to seek reparations).

Child abuse was recognized as a medical diagnosis at least as early as 1962 with the publication of Dr. C. Henry Kempe's re-

---

**4.** The Beckers urge our court to apply the three-factor test from *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to determine whether the violation of a statute creates a civil cause of action. *Cort* provides that a statute creates a cause of action when: (a) the plaintiff belongs to the class for whose benefit the statute was enacted; (b) the legislature indicated an explicit or implicit intent to create a civil remedy; and (c) implying a civil remedy would be consistent with the underlying purposes of the legislative enactment. *Id.* at 78, 95 S.Ct. 2080. Mayo re-

sponds that *Cort* has been effectively rejected and that "the intent of Congress is the crucial and dispositive factor for analysis." *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (holding that the section of the Securities and Exchange Act requiring broker dealers to keep records and file reports as required by the Securities and Exchange Commission did not create a private cause of action in favor of anyone). We conclude that in this case the legislature's intent is clear and dispositive under either party's proposed test.

port, "The Battered Child Syndrome." Victor I. Vieth, *Passover in Minnesota: Mandated Reporting and the Unequal Protection of Abused Children*, 24 Wm. Mitchell L.Rev. 131, 134–35 (1998). Vieth also noted that "[c]oinciding with Kempe's work, the [federal] Children's Bureau of the Department of Health, Education and Welfare considered a model child abuse reporting statute which was developed in 1963. Two other model laws were developed in 1965 * * *." *Id.* at 135. By 1967, all fifty states, the District of Columbia, and the Virgin Islands had enacted some sort of mandated reporting statute. *Id.* Today, all states have a reporting statute that imposes a criminal penalty for failing to report child abuse as a means to enforce the law. Steven J. Singley, *Failure to Report Suspected Child Abuse: Civil Liability of Mandated Reporters*, 19 J. Juv. L. 236, 238–39 (1998). Statutes in seven states—Arkansas, Colorado, Iowa, Michigan, Montana, New York, and Rhode Island—also impose civil liability. Singley, *supra*, at 239 n. 12. The vast majority of courts outside of these seven states have held that their reporting statutes do not create a civil cause of action.[5] Regardless of what other courts do, we must base our decision on the best public policy for the State of Minnesota. *See Larson v. Dunn*, 460 N.W.2d 39, 44 (Minn.1990) (declining to create a new tort, "intentional interference with custodial rights," even though the trend in other states was toward recognizing the tort).

CARA provides that a mandatory reporter who "knows or has reason to believe" that a child is being neglected or abused "shall immediately report the information to the local welfare agency" or local law enforcement. Minn.Stat. § 626.556, subd. 3(a) (2006). "Mandatory reporters" include doctors, nurses, social workers, child care providers, teachers, law enforcement officers, and clergy. *Id.* A mandatory reporter "who knows or has reason to believe that a child is neglected or physically or sexually abused * * * and fails to report is guilty of a misdemeanor." Minn. Stat. § 626.556, subd. 6(a) (2006). CARA says nothing about civil penalties for failure to report.

■ We conclude that CARA's text is unambiguous. The plain language of the statute indicates that the legislature chose to impose criminal, but not civil, penalties on mandatory reporters who fail to report. Other language in CARA demonstrates that the legislature expressly creates civil liability when it intends to do so. In the subdivision of CARA immediately adjacent to subdivision 6(a), the legislature created civil liability for making a malicious or reckless report of child abuse. Minn.Stat. § 626.556, subd. 5 (2006). It also did so in the immediately adjacent statute, the Vulnerable Adults Reporting Act, for failure to report abuse of a vulnerable adult. Minn.Stat. § 626.557, subd. 7 (2006). For

5. *See, e.g., Cuyler v. U.S.*, 362 F.3d 949 (7th Cir.2004) (Illinois law); *Doe v. D'Agostino*, 367 F.Supp.2d 157 (D.Mass.2005); *Isely v. Capuchin Province*, 880 F.Supp. 1138 (E.D.Mich.1995); *C.B. v. Bobo*, 659 So.2d 98 (Ala.1995); *Fischer v. Metcalf*, 543 So.2d 785 (Fla.Dist.Ct.App.1989); *Borne v. Northwest Allen County School Corp.*, 532 N.E.2d 1196 (Ind.Ct.App.1989); *Kansas State Bank & Trust Co. v. Specialized Transp. Servs. Inc.*, 249 Kan. 348, 819 P.2d 587 (1991); *Marquay v. Eno*, 139 N.H. 708, 662 A.2d 272 (1995); *Doe v. Marion*, 361 S.C. 463, 605 S.E.2d 556 (2004), *cert. granted* (April 19, 2006); *Perry v. S.N.*, 973 S.W.2d 301 (Tex.1998); *Arbaugh v. Bd. of Educ.*, 214 W.Va. 677, 591 S.E.2d 235 (2003). There are, however, contrary voices. *See, e.g., Ham v. Hosp. of Morristown, Inc.*, 917 F.Supp. 531, 537 (E.D.Tenn.1995) (holding that Tennessee reporting act creates civil liability); *Landeros v. Flood*, 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389 (1976) (holding that violation of reporting statute may constitute negligence per se).

the forgoing reasons, we cannot conclude that the legislature "implied" a cause of action that it chose not to include in the statute. *See* W. Page Keeton, et. al., *Prosser and Keeton on the Law of Torts* § 36, at 221 (5th ed. 1984) ("The obvious conclusion must usually be that when the legislators said nothing about it, they either did not have the civil suit in mind at all, or deliberately omitted to provide for it."). We therefore conclude that CARA does not create civil liability.

### B. *Radke*

Our decision in *Radke* is consistent with our conclusion with respect to CARA. In *Radke*, we held that a civil cause of action will lie against a county for negligence in investigating reports of child abuse as required by CARA. 694 N.W.2d at 798. Makaio Radke was an infant abused by his mother's live-in friend. *Id.* at 791. Makaio's physician and father both repeatedly reported the suspected abuse to county authorities, who repeatedly visited Makaio at home but did nothing to prevent the abuse. *Id.* at 791–92. Makaio was eventually beaten to death. *Id.* at 792. Makaio's father sued Freeborn County, among others, asserting that the county owed a special duty to Makaio to act with care in investigating reports of abuse. *Id.*

The district court granted the county's motion to dismiss for failure to state a claim on which relief could be granted, and the court of appeals affirmed. *Id.* at 792–3. The court of appeals held that "[t]he legislature did not expressly or impliedly create a civil cause of action" under CARA. *Radke v. County of Freeborn,* 676 N.W.2d 295, 301, (Minn.App.2004), *rev'd,* 694 N.W.2d at 799. The court relied on our holding in *Hoppe v. Kandiyohi County,* 543 N.W.2d 635 (Minn.1996), that the Vulnerable Adults Reporting Act did not confer a private cause of action for failure to conduct timely investigations on reports of abuse to vulnerable adults. *Radke,* 676 N.W.2d at 301.

We reversed the court of appeals, holding that the county owed a special duty to Makaio under CARA and that Makaio's father could maintain a private cause of action. *Radke,* 694 N.W.2d at 798–99. In *Radke,* we analyzed the four factors [6] set forth in *Cracraft v. City of St. Louis Park,* 279 N.W.2d 801 (Minn.1979), to determine whether a statute creates a special duty between a governmental unit and an individual. *Radke,* 694 N.W.2d at 794. We held that the third *Cracraft* factor—whether the statute set forth mandatory acts for the protection of a particular class of persons—was met because CARA "clearly and repeatedly requires the performance of mandatory acts" and because those acts were for the protection of "a particular class of persons-children who are identified as abused or neglected." *Id.* at 797. We also held that the first *Cracraft* factor—whether the county had actual knowledge—was met because the county received numerous reports of suspected abuse. *Id.* We could not conclusively determine whether the second factor—whether there was reasonable reliance on the county's representations and conduct—was met. *Id.* at 797–98. While the fourth factor—whether the county increased the

---

**6.** The four factors analyzed in *Radke* were:
(1) Whether the governmental unit had actual knowledge of the dangerous condition;
(2) whether there was reasonable reliance by persons on the governmental unit's representation and conduct * * *; (3) whether an ordinance or statute set forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole; and (4) whether the governmental unit used due care to avoid increasing the risk of harm.
*Radke,* 694 N.W.2d at 794; *see Cracraft,* 279 N.W.2d at 806–07.

risk of harm—was not met, we concluded that failure to meet this factor was not dispositive. *Id.* at 798.

Because the third *Cracraft* factor was "overwhelmingly dominant," we held that the county owed Makaio a special duty. *Id.* Given the legislature's express intent to provide safety and protection for children through the immediate action of county child protection workers, we said that

it is incongruous to conclude that the legislature intended to impose criminal penalties on those persons who fail to report as mandated under the statute, but intended that there be no *duty* on the part of the county welfare department or its employees to investigate or act on the reports.

*Id.* In so holding, we overruled *Hoppe.* *Id.* at 799.

The Beckers acknowledge that *Radke* only recognized a cause of action for failure by a county to investigate and intervene once suspected abuse has been reported. But they nonetheless argue that because reporting is the only event that can initiate the investigatory process, "it is incongruous to conclude that the legislature intended to impose only criminal penalties on those persons who fail to report as mandated under the statute." We are not persuaded by the Beckers' argument.

*Radke* reconciled the incongruity between imposing criminal sanctions on mandatory reporters and imposing no sanctions whatsoever on investigators. But there is no manifest incongruity in imposing criminal, but not civil, liability on mandatory reporters. Here, the legislature chose to encourage reporting of suspected child abuse with the threat of criminal liability alone, and we must assume that the legislature had good reason for doing so. Accordingly, we conclude that *Radke* does not explicitly or by implication support the Beckers' claim that we must recognize a private cause of action under CARA for failure to report suspected child abuse.

## C. *Policy arguments*

Having concluded that CARA is unambiguous notwithstanding our decision in *Radke,* we normally would not address the policy issues that the Beckers' have raised. Nevertheless, because these arguments focus on how we as a society through legislative action deal with the issue of protecting abused children, we will address these policy arguments.

The Beckers and several amici argue that for CARA to fulfill its stated purpose of protecting abused children, health care providers who are the "first line of protection" for abused children must be encouraged to report suspected abuse and the way to do so is to use the threat of civil liability. Mayo responds that this argument is better directed to the legislature, which can use its fact-finding power to determine how to best prevent child abuse.

The idea that the threat of civil liability will lead inexorably to increased reporting, and that this will reduce child abuse, has a certain appeal, but this appeal may be illusory. At least one commentator has suggested that imposing civil liability for failure to report is actually counterproductive, because it will "substantially contribute[ ] to the case overload of Child Protective Services [ ] and to unsubstantiated reports, which ultimately work against children in danger." Singley, *supra,* at 237. We are not unmindful of the tragedy of child abuse in our society; however, in this area of the law, where important interests are at stake and the effects of an expansion of the law are unclear, we leave it to the legislature with its fact-finding power to determine whether civil liability is appropriate.

The Beckers also argue that CARA's criminal penalties lack force because mandatory reporters are rarely, if ever, prosecuted. Although the lack of actual prosecutions for failure to report child abuse may be troubling, it does not influence our analysis in this case. The Beckers do not cite, and we have not found, any precedent allowing our court to create civil liability because the state executive branch is not adequately enforcing the criminal law.

The Beckers and amici also refer to Minn.Stat. § 626.556, subd. 4(a) (2006), in support of their policy argument that we should recognize civil liability for mandatory reporters under CARA. Subdivision 4(a) grants civil and criminal immunity to good faith reporters of child abuse. The Beckers assert that this grant of civil immunity demonstrates a legislative intent to impose civil liability for failure to report abuse. We disagree. Subdivision 4(a) grants civil immunity to those who report; it says nothing about those who fail to report. If the legislature had intended to create civil liability for failure to report, we would expect the immunity provision to expressly disclaim civil immunity for such a failure. If anything, the absence of an express disclaimer affirms what subdivision 3(a) makes clear—the legislature did not intend to impose civil liability for failure to report suspected child abuse. In addition, there is ample pre-existing civil liability from which the immunity provision provides shelter. Physicians who report abuse, for example, would ordinarily face civil liability for violating doctor-patient confidentiality or for making a report that ultimately turns out to be unfounded.

For all the foregoing reasons, we hold that CARA does not create a civil cause of action for failure to report suspected child abuse.

## II.

We next address the Beckers' claim that Mayo had a "special relationship" with Nykkole that created a duty to protect her from further injuries at the hands of her parents. Mayo asserts that no such relationship existed and that it had no such duty.

As a threshold matter, Mayo argues that the Beckers forfeited the special relationship argument by not raising it before the district court. We have stated that theories not raised at trial cannot be raised for the first time on appeal. *Stumne v. Village Sports & Gas,* 309 Minn. 551, 553, 243 N.W.2d 329, 330 (1976). Further, the court of appeals has held that "[a] party may not raise an issue for the first time in a motion for new trial." *In re Trusteeship of Trust of Williams,* 631 N.W.2d 398, 407 (Minn.App.2001). On the other hand, we have held that "[t]he duty or degree of care imposed on a party is fundamental law and objections to instructions relative thereto could be assigned for the first time in a motion for new trial." *Urban v. Minneapolis St. Ry. Co.,* 256 Minn. 1, 4, 96 N.W.2d 698, 700 (Minn.1959); *see also Marriage of Gottsacker v. Gottsacker,* 664 N.W.2d 848, 859 (Minn.2003) (noting that the court of appeals has consistently held that a post-trial motion based on a theory of recovery not raised at trial is properly denied, but analyzing the merits of the claim anyway). In this proceeding, the court of appeals held that the special relationship issue was properly before it because the Beckers raised the issue in their Memorandum of Law in support of their motion for a new trial. *Becker,* 2005 WL 3527163, at *4; *see* Minn. R. Civ.App. P. 110.01 (stating that the record on appeal consists of all papers filed in the trial court). Because the issue is important and has been fully briefed by both parties, we will address it.

Substantively, Mayo argues that there is no special relationship between Nykkole and Mayo because Nykkole was harmed at home, not at the hospital. The court of appeals agreed, noting that "[c]ases holding that a hospital has a special relationship with a patient are limited to situations where the patient was admitted and harmed by others while in the custody of the hospital." *Becker*, 2005 WL 3527163, at *5. While acknowledging that it was "no easy decision," the court reasoned that because "Nykkole was not harmed while in custody of the hospital but was harmed while in the custody of her parents," there was no special relationship. *Id.*

The existence of a duty is a question of law we decide de novo. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn.1985). The general common law rule is that a person does not have a duty to give aid or protection to another or to warn or protect others from harm caused by a third party's conduct. *Delgado v. Lohmar*, 289 N.W.2d 479, 483–84 (Minn.1979). An exception to this general rule arises when the harm is foreseeable [7] and a special relationship exists between the actor and the person seeking protection. *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 168–69 (Minn. 1989). These circumstances create a duty to protect. In *Donaldson v. Young Women's Christian Ass'n*, we said: "[t]ypically, the plaintiff is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare." 539 N.W.2d 789, 792 (Minn.1995); *see also H.B. ex rel. Clark v. Whittemore*, 552 N.W.2d 705, 708 (Minn.1996) (citing Restatement (Second) of Torts § 314A cmt. b (1965)). The Restatement recognizes four types of special relationships: (1) common carrier and passenger; (2) innkeeper and guest; (3) possessor of land who holds it open to the public and invitee; and (4) where either one who is required by law or one who voluntarily takes custody of another under circumstances such as to deprive the other of his normal opportunities for protection. Restatement (Second) of Torts § 314A (1965).[8] "[I]t should be recognized that 'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." Keeton, et al., *supra*, § 53, at 358.

We have considered assertions of special relationships in several cases. In *Whittemore*, we held that a trailer park manager did not have a duty to report to outside authorities that children residing in the park were being sexually abused. 552 N.W.2d at 708–09. We noted that the park manager did not accept the children's entrustment, that the children were not in the manager's custody, and that the manager exercised no control over the children's daily welfare. *Id.* Similarly, in *Donaldson*, we held that the YWCA owed no duty to prevent residents from committing suicide because the YWCA had no custody or control of its guests and guests had no dependence on the YWCA. 539 N.W.2d at 793. In *Harper v. Herman*, we found no special relationship between a boat owner and his guest, and thus no duty on the boat owner to warn of the dangers of diving in shallow water. 499 N.W.2d 472 (Minn.1993). We observed that the guest was not particularly vulnerable and that the boat owner had no power over the passenger's welfare and did not stand to gain financially by having him on the boat.

---

7. Mayo has not argued that further harm to Nykkole was unforeseeable.

8. The Restatement takes no position as to whether there may be other special relationships. § 314A, Caveat.

*Id.* at 474. But in *Erickson,* we held that because of the "unique opportunity for criminals and their criminal activities" in a parking ramp, a parking ramp owner owed a duty to use reasonable care to deter criminal activity on its premises. 447 N.W.2d at 169.

We have also considered the scope of the duties owed a patient by a hospital. *See Clements v. Swedish Hosp.,* 252 Minn. 1, 89 N.W.2d 162 (1958) (holding that a hospital does not assume responsibility for treatment of a patient's mental disturbance leading to a suicide attempt when the patient is admitted for treatment of injuries sustained in an automobile accident); *Sylvester v. Northwestern Hosp.,* 236 Minn. 384, 386, 53 N.W.2d 17, 19 (1952) (holding that a hospital is liable for damages suffered by one of its patients when another patient assaults her because the reasonable care to be exercised by a hospital "must always be in proportion to the patient's inability to look after his own safety"); *Mesedahl v. St. Luke's Hosp. Ass'n,* 194 Minn. 198, 259 N.W. 819 (1935) (holding that a hospital has a duty to use reasonable care to prevent a patient's suicide if a reasonably prudent person under the circumstances should have anticipated a suicide attempt). As the court of appeals observed, *Sylvester* and *Mesedahl* involved inpatients over whom the hospital had custody to some degree. More importantly, those cases identified a duty on the hospital to protect patients from harm that occurred at the hospital and was within the hospital's control.

The factors we have consistently examined when confronted with a special relationship claim are the vulnerability and dependency of the individual, the power exerted by the defendant, and the degree to which the defendant has deprived the plaintiff of her ordinary means of protection. Some of these factors arguably weigh in favor of recognizing a special relationship in this case. A two-month old child is unquestionably vulnerable. Further, an abused two-month-old child is unlikely to come into contact with other mandatory reporters such as educators or clergy, and so is completely dependent on her treating physicians to discover and prevent further abuse. Nykkole could not be said to have been deprived of ordinary means of protection, however, because she never had any such means.

■ On the other hand, *Whittemore* suggests that there was no special relationship here. It is unlikely that Mayo intended to accept absolute authority over Nykkole; Mayo only intended to treat her for the discrete injuries she presented. Mayo did not exercise control over Nykkole's daily welfare—her parents did. Furthermore, the cases recognizing a special relationship (*Erickson, Sylvester,* and *Mesedahl*) all involve some control by the defendant over the harm-causing agent. Mayo had no control over Rossini's actions.

The facts in this case present a close and difficult question. Ultimately, we conclude that, because the harm suffered by Nykkole was suffered outside the hospital at the hands of a third party Mayo could not control, and because Mayo did not accept custody of Nykkole, no special relationship was formed.

### III.

Our conclusions that CARA does not create a civil cause of action for failure to report suspected child abuse and that Mayo did not have a special relationship with Nykkole giving rise to a duty to protect her from harm do not end our inquiry. The Beckers also assert that Nykkole's treating physicians deviated from the expected standard of professional skill and care by not reporting suspected child abuse to outside authorities. This claim is

distinct from the civil cause of action based on CARA that we rejected above.

Although the district court did not strike the Beckers' common law cause of action, it granted Mayo's motion to exclude all reporting-related evidence. As a result of this ruling, the Beckers were prevented from introducing evidence that Mayo failed to conform to accepted standards of medical practice by failing to report Nykkole's suspected abuse. Because the Beckers were unable to argue to the jury that Mayo should have reported the suspected abuse, they could only argue that Mayo was negligent in failing to indefinitely hospitalize Nykkole. The Beckers assert that the court's ruling "distorted and prejudiced the entire trial and left a huge gap in the causation picture," which "made it impossible for the jury to connect the dots between Respondent's negligence and the abuse inflicted."

An error in the exclusion of evidence is grounds for a new trial if it appears that the evidence "might reasonably have changed the result of the trial if it had been admitted." *Poppenhagen v. Sornsin Constr. Co.*, 300 Minn. 73, 79–80, 220 N.W.2d 281, 285 (1974). "Where a case is close on the facts[,] rejection of competent and material evidence is reversible error." *Kellett v. Wasnie*, 261 Minn. 440, 450, 112 N.W.2d 820, 826 (1962).

In granting Mayo's motion to strike, the district court relied on *Valtakis*, 504 N.W.2d at 266, and *Bruegger*, 497 N.W.2d at 262. *Valtakis* held that CARA does not create civil liability for failure to report suspected child abuse. 504 N.W.2d at 267. In *Bruegger*, we held that the Crime Victims Reparations Act does not create a private cause of action against law enforcement agencies that fail to inform crime victims of the rights to seek reparations. 497 N.W.2d at 260. It does not follow from either of these holdings that there is no *common law* cause of action for failure to report suspected child abuse.

Nor did striking counts (c), (d), and (e) from the Beckers' complaint require the district court to exclude all reporting-related evidence from trial. Count (b), which alleged that Mayo was negligent in "failing to recognize and treat signs and symptoms of head trauma in an infant with a history of suspicious traumatic injury," would support the introduction of evidence that reporting suspected child abuse to outside authorities is part of the accepted treatment of suspicious injuries in children. As the Beckers noted in their response to Mayo's motion in limine to exclude reporting-related evidence, the fact that CARA does not statutorily create civil liability for failure to report suspected child abuse does not preclude the Beckers from "addressing the issue of government reporting at trial insofar as it concerns the many treatment options available to defendant in fulfilling its duty to keep Nykkole Becker safe."

The court of appeals concluded that evidence related to Mayo's failure to report abuse was admissible, but held that its exclusion was harmless because it was unlikely to influence the jury's causation analysis:

> [T]he jury could have been told about the reporting evidence, or lack thereof, as relevant. The jury would have gotten a fuller picture and respondent would not have been prejudiced. The jury simply would have had a picture of "what is," meaning, what happened. Having said that, we do not find reversible error.

2005 WL 3527163, at *5.

We disagree with both the district court and the court of appeals. We conclude that the district court erred when it granted Mayo's motion to exclude reporting-related

evidence, and that this error requires a new trial because admission of this evidence might reasonably have changed the result at trial. We reach this conclusion for the following reasons.

### A. Offer of proof

██ As a threshold matter, Mayo argues that the Beckers made no offer of proof that calling the county earlier would have prevented Nykkole's abuse. An offer of proof is a prerequisite to motions for a new trial and appeals based on exclusion of evidence. Minn. R. Evid. 103(a)(2); *State v. Bd. of Educ.*, 277 N.W.2d 524, 528 (Minn.1979). "In practice, Minnesota courts permit an attorney to make a proffer by informing the court of a witness's expected testimony." *Santiago v. State*, 644 N.W.2d 425, 442 (Minn.2002). "If the problem has been brought to the attention of the court, and the court has indicated in no uncertain terms what its views are, to require an objection would exalt form over substance." *State v. Lane*, 582 N.W.2d 256, 259 (Minn.1998).

The Beckers raised the failure to report claim in their complaint. After the district court granted Mayo's motion to strike counts (c), (d), and (e), the Beckers submitted by affidavit the anticipated testimony of Dr. Carolyn Levitt that accepted medical practice required Mayo to report Nykkole's suspected abuse to the proper authorities and that such a report would have led to Nykkole's immediate removal from Koob and Rossini's custody. The Beckers also submitted the anticipated testimony of Dr. Allen Walker that "reporting the suspected abuse [on September 11] would likely have led authorities to investigate the abuse and protect the child pending the investigation and subsequent findings of abuse."

██ In response to Mayo's motion in limine to exclude all reporting-related evidence, the district court apparently ruled from the bench, following a conference in chambers, that no evidence regarding the possibility of reporting suspected child abuse to government authorities would be permitted.[9] After trial—in its denial of the Beckers' motion for a new trial—the district court noted that "plaintiffs have made it abundantly clear throughout the litigation of the case, what their theory of liability is and what it relies on.  * * *  For that reason, the court is not denying the new trial motion on the insufficiency or timeliness of the offer of proof."[10] More importantly, the record reveals what actu-

---

9. The record before us is less than clear on this point, as there is no order or memorandum from the court on Mayo's motion in limine and as the Beckers' counsel apparently conceded in pretrial discussions that, as a result of the court's ruling on the applicability of CARA, the Beckers would not "present or elicit any testimony which would claim that it should have been reported or anything like that with respect to governmental reporting." Nonetheless, it is apparently undisputed that the Beckers were precluded by an evidentiary ruling by the district court from mentioning that Mayo could have reported suspected abuse to governmental authorities.

10. We interpret the district court's statement to indicate that the court would have admitted the excluded evidence but for the court's

erroneous conclusion that *Valtakis* and *Bruegger* preclude the Beckers' common law claim for failure to report suspected child abuse. In other words, it appears that the district court implicitly ruled that the Beckers' offer of proof would be sufficient notwithstanding the absence of testimony from Olmsted County authorities on how they might have protected Nykkole. Unlike the dissent, we do not conclude that the district court's implicit ruling constitutes an abuse of discretion. *See Santiago*, 644 N.W.2d at 442 ("We review a court's rulings on the sufficiency of offers of proof under an abuse of discretion standard."). We must therefore address whether the exclusion of the reporting-related evidence requires reversal.

ally happened when Mayo diagnosed and reported Nykkole as a victim of abuse: she was taken from her biological parents and placed in foster care. Under these circumstances, where the district court made clear to the parties in its ruling on a Rule 12 motion that it was not interested in hearing any evidence related to Mayo's duty to report and where the record shows what actually happened when Mayo did report, we conclude that the Beckers made a sufficient offer of proof. To conclude otherwise—that is, to penalize the Beckers for not forcing upon the court evidence that it had already categorically rejected— would be unreasonable.

### B. Standard of care

■ To establish a claim for negligent care and treatment in a medical malpractice action, a plaintiff must typically introduce expert testimony demonstrating: (1) the standard of care in the medical community applicable to the particular defendant's conduct; (2) that the defendant departed from the standard of care; and (3) that the departure from the standard of care directly caused the plaintiff's injury. *Bigay v. Garvey*, 575 N.W.2d 107, 111, n. 4 (Minn.1998) (quoting *Plutshack v. Univ. of Minn. Hosps.*, 316 N.W.2d 1, 5 (Minn. 1982)). The Beckers' attempted use of reporting-related evidence and testimony implicates both the standard of care and causation elements.

■ Once a physician undertakes to treat a patient, that physician owes the patient a duty to act with the required standard of skill and care. *Walker v. Holbrook*, 130 Minn. 106, 109, 153 N.W. 305, 306 (1915). The standard of skill and care required of all physicians is that degree of skill and care possessed and exercised by practitioners engaged in the same type of practice under like circumstances. *Lundgren v. Eustermann*, 370 N.W.2d 877, 880

(Minn.1985). A physician's standard of care is judged by whether the physician's actions conformed to the ordinary skill and ability of the members of his profession in good standing. *Quickstad v. Tavenner*, 196 Minn. 125, 127, 264 N.W. 436, 437 (1936). "Since the standard of care is not established and promulgated, but rather is a matter of opinion, concerning which there frequently is disagreement, a potential medical negligence claim exists whenever a qualified expert is willing to testify that the standard has been breached." Steven J. Kirsch, 5A Minnesota Practice, *Methods of Practice*, § 11.7, at p. 565. "In [medical-]malpractice cases[,] the standard of care is a question of fact for the jury." *Lane v. Skyline Family Med. Ctr.*, 363 N.W.2d 318, 324 (Minn.App.1985).

■ Mayo notes that the Beckers have cited no case holding that failure to report suspected child abuse is a breach of the standard of care. This failure is not fatal to their claim:

> Novelty of an asserted right and lack of common-law precedent * * * are no reasons for denying its existence. The common law does not consist of absolute, fixed, and inflexible rules * * *. Its principles have been determined by the social needs of the community and have changed with changes in such needs.

*Miller v. Monsen*, 228 Minn. 400, 406, 37 N.W.2d 543, 547 (1949). If Mayo's failure to report suspected child abuse, given the injuries with which Nykkole presented, did not conform to the ordinary skill and care expected of a physician, the Beckers have established a prima facie case of medical malpractice.

The Beckers offered to the district court the testimony of Dr. Allen Walker that "the standard of care arising from the physician-patient relationship between the defendant and Nykkole required defendant to hospitalize Nykkole for care of her inju-

ries, to perform additional diagnostic tests, and to report suspected child abuse to the proper authorities." The Beckers also offered the testimony of Dr. Carolyn Levitt that Mayo "failed to meet even minimal standards of care in protecting Nykkole from ongoing abuse." The Beckers also referenced, as part of their offer of proof, statements from medical journals that physicians "should report possible willful trauma to the police department or any special children's protective service that operates in the community" (C. Henry Kempe, *The Battered Child Syndrome*, 181 J. Am. Med. Ass'n 17, 23 (1962)) and "should report [suspected cases of maltreatment] to the child protective society in his community or to the law enforcement agency for appropriate action to protect the child" (Vincent J. Fontana, et al., *"The Maltreatment Syndrome" in Children*, 269 New Eng. J. Med. 1389, 1393 (1963)).[11]

The foregoing evidence would have allowed a reasonable jury to conclude that the accepted standard of care required Mayo's physicians to report Nykkole's suspected abuse. The evidence was relevant to the Beckers' claim in count (b) that Mayo failed to appropriately treat Nykkole's injuries, and we conclude that it was error to exclude this evidence.

We find *Landeros v. Flood*, 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389 (1976), instructive. In *Landeros*, an abused child was brought to the emergency room with obvious signs of abuse. *Id* at 391. The hospital staff did not report the abuse to authorities and released the child, after which the abuse continued. *Id.* In a suit against the hospital for damages, the dis-

trict court concluded as a matter of law that the applicable standard of professional care did not include reporting the abuse, and the California Supreme Court reversed. *Id.* at 394. The California court held that because the standard of professional care in a child abuse case was not a matter "within the common knowledge of the layman," the plaintiff was "entitled to the opportunity to prove by way of expert testimony that in the circumstances of this case a reasonably prudent physician would have followed those procedures." *Id.*

Here, it is important to note that our conclusion that the Beckers have presented a prima facie case of medical malpractice only means that they are entitled to present that case to a jury. Our conclusion does not preclude Mayo from presenting evidence that its physicians acted with ordinary skill and care or that Nykkole's injuries and her biological parents' behavior were such that the failure to report suspected child abuse was not a deviation from the standard of care.

■■■■■■ If the Beckers are entitled to present a medical malpractice claim for failure to report suspected child abuse to a jury, the question arises whether CARA's reporting mandate may be introduced as evidence of the duty to report. We have held that hospital rules are admissible as evidence of the standard of care in a community. "A rule requiring the presence of a physician-assistant at a major operation is evidence of accepted medical practice in the community in which it was adopted and therefore is relevant and material in a medical malpractice action * * *." *Boland v. Garber*, 257 N.W.2d 384, 386 (Minn.1977). Such rules are not conclusive

---

11. We also note that Battered Child Syndrome is a recognized medical diagnosis, so the Beckers' medical malpractice claim is not premised on a novel or unusual medical theory. *See State v. Loss*, 295 Minn. 271, 279, 204

N.W.2d 404, 408 (Minn.1973) (noting that Battered Child Syndrome was a medical diagnosis first recognized in the late 1950s and early 1960s).

on the issue of negligence. *Id; see also Bentley v. Carroll*, 355 Md. 312, 734 A.2d 697 (1999) (holding that a finding of violation of the reporting requirements of the Maryland Child Abuse Act would be evidence of negligence). Under the rule of *Boland*, CARA's reporting requirement is admissible as evidence that a physician of ordinary skill who suspects that a patient is the victim of child abuse will report the suspected abuse to outside authorities.

### C. Causation

Our analysis does not end with our conclusion that the reporting evidence was erroneously excluded. To require a new trial, the wrongfully excluded evidence must have had a reasonable likelihood of affecting the jury's verdict.

■ We believe that reporting-related evidence had a reasonable likelihood of affecting the jury's verdict in this case. The Beckers were entitled to present to the jury the full picture of the alternatives available to Mayo to treat Nykkole. Instead, they could only argue that Mayo should have hospitalized Nykkole indefinitely. We believe the average juror would understand that a hospital has no inherent authority to confine an infant without her parents' consent and that the hospital must contact law enforcement authorities to do so. Therefore, the theory actually advanced by the Beckers at trial—that Mayo was negligent in failing to hospitalize Nykkole indefinitely—would have appeared somewhat implausible.[12]

Mayo argues that the county did not have any greater resources to prevent Nykkole's abuse than Mayo itself had, so that reporting to the county would not

have prevented Nykkole's injuries. The district court agreed:

> [T]he jury knew full well what measures were available to protect Nykkole Becker from further abuse and that Mayo staff did not take advantage of them because they did not reach the threshold of diagnosing abuse on August 17 or September 11. That is the case Plaintiffs were entitled to try. They were unhampered in their efforts to do so.

Thus, the "only" thing that was excluded was the fact that Mayo did not alert outside authorities.

If we could be certain that the negligence identified by the jury was Mayo's failure to diagnose Battered Child Syndrome, this would imply that the jury did not believe that hospitalizing Nykkole indefinitely would have prevented her injuries, and it would be difficult to see how returning Nykkole to her parents and then calling county authorities would have more effectively protected her. As Mayo points out, however, we do not know what conduct the jury found to be negligent. Mayo's own expert conceded that there was negligent documentation in Nykkole's records. It is possible that the jury found this or some other aspect of Mayo's care negligent but that it would have found differently with reporting-related testimony and evidence. It is also possible that the jury found that Nykkole's symptoms did not justify hospitalizing her indefinitely, but would have found that they justified notifying the proper authorities. We conclude that reporting-related evidence might reasonably have changed the jury's standard of care and/or causation analysis;

---

12. We note that CARA's civil immunity provision protects a physician who makes a good-faith report of suspected abuse, not a physician who confines a child based on a mistaken suspicion of abuse. Thus, a physician would need a much higher degree of certainty before confining a child to protect her from abuse than before reporting the suspected abuse.

therefore, our standard of review requires a new trial.

Mayo argues that the causal connection between failure to report abuse and injuries resulting from the abuse is extremely tenuous. While this may be true, civil liability exists for failure to report abuse in other contexts, notably under the Vulnerable Adults Reporting Act, so the issue cannot be said to be beyond the capabilities of a jury. Amici also point out that, if a cause of action for failure to report is permitted, comparative fault principles may result in the joinder of other mandatory reporters who may have seen the abused child. While this also may be true, it is not an issue according to the record in this case and it is not a reason to jettison the Beckers' entire cause of action.

We hold that the exclusion of the reporting-related evidence requires reversal and the grant of a new trial.

Affirmed in part, reversed in part, and remanded.

PAGE, J., took no part in the consideration or decision of this case.

ANDERSON, G. BARRY, dissenting.

I respectfully dissent. I agree with the majority that CARA does not create a civil cause of action for failure to report suspected child abuse and that Mayo had no special relationship with Nykkole giving rise to a duty to protect her from the harm that she suffered. Unlike the majority, however, I would not reach the question of whether the district court erred by excluding evidence of a common law duty to report because the Beckers did not make a sufficient offer of proof that earlier reporting would have prevented Nykkole's injuries.

Where a court excludes evidence at trial, error may not be predicated upon the exclusion unless "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Minn. R. Evid. 103(a)(2). "Where no offer of proof is made so that the reviewing court may pass on the relevancy of the proposed evidence, the exclusion of such evidence is not prejudicial error." *State v. Bd. of Educ.*, 277 N.W.2d 524, 528 n. 3 (Minn.1979). "Even if [exclusion of testimony] were an abuse of discretion, we would be unable to determine if it was prejudicial inasmuch as no offer of proof was made as to what testimony [the witness] would give." *Wozniak v. Luta*, 258 Minn. 234, 241, 103 N.W.2d 870, 875 (1960). The primary reason for requiring an offer of proof is so that the court on appeal can understand from the record the scope and effect of the proposed evidence in considering whether its exclusion was proper. John William Strong, McCormick on Evidence, 195–96 (4th ed.1992).

The Beckers argue in their brief that they "were clear from the beginning that evidence of reporting was crucial to prove their common law negligence claim." I agree that the Beckers made clear the centrality of reporting to their case, but what they did not make clear—and were required to—is how earlier reporting would have prevented Nykkole's injuries. I agree with the majority that the requirements for an offer of proof are not high, but the Beckers did not meet even their minimal burden here.

After the district court struck the three counts from their complaint, the Beckers submitted by affidavit the anticipated testimony of two physicians. Dr. Carolyn Levitt was expected to testify that failure to report suspected child abuse was a breach of Mayo's standard of care, and that "the required report of the suspected abuse to proper authorities would have led to immediate removal of Nykkole from her birth

parents' custody." Dr. Allen Walker was also expected to testify that the expected standard of care was breached and that "reporting the suspected abuse would likely have led authorities to investigate the abuse and protect the child pending the investigation and subsequent findings of abuse." The affidavit did not assert, and nothing in the record established, that Drs. Levitt or Walker had any knowledge of Olmsted County's resources or practices for investigating allegations of child abuse or protecting alleged victims. Indeed, there is no indication anywhere in the record that Drs. Levitt and Walker had worked with Olmsted County on similar matters. These two conclusory statements by witnesses who professed no personal knowledge of how Olmsted County authorities might have protected Nykkole constituted the entirety of proof of causation offered to the district court before trial.

After trial, the Beckers attached an affidavit to their motion for a new trial in which an attorney stated that she had "on several occasions contacted employees of the Olmsted County Child Protection Unit about their involvement with Nykkole Becker's case" and that she had "discussed the policies and procedures in place at Child Protection in 1997, and how Child Protection likely would have responded to Nykkole's particular situation in light of those policies and procedures." Based on these conversations, the attorney stated that the Beckers, if allowed, would have subpoenaed these unidentified employees and that in the attorney's opinion their testimony would have demonstrated that a report of suspected child abuse would more than likely have prevented Nykkole's injuries. An attorney's opinion, citing conclusory, unidentified secondhand sources, is a woefully inadequate offer of proof.

While there are no doubt many varieties of an offer of proof that could have been

successfully executed, one way to proceed under these circumstances would have been to present the district court with the anticipated testimony of an Olmsted County Child Protection worker as to what steps are taken when a report of suspected child abuse is made and how long the investigation typically takes. That offer of proof could have been made in numerous ways, including direct examination of the witness outside the presence of the jury or, more probably here, simply by counsel outlining what the identified witness would testify to if called. Without this information, however presented, this court can only speculate about what any witness familiar with Olmsted County Child Protection Unit would have testified to and whether this testimony would have allowed a reasonable jury to find that earlier reporting would have prevented Nykkole's injuries.

Contrary to the majority's assertion, the fact that Nykkole was taken from her biological parents after she arrived at the emergency room on September 15, with catastrophic, permanent injuries does not inform us of what would have happened if a report of suspected child abuse had been filed on August 27, when Nykkole presented with a broken arm, or on September 11, when she was vomiting and lethargic. Some idea of the anticipated time frame for a response by the appropriate government agency to a report of suspected child abuse is particularly important here because if the jury found Mayo negligent for not making a report on August 27, authorities would have had almost a month to protect Nykkole, but if the jury found Mayo negligent on September 11 and not on August 27, authorities would have had only 4 days.

I acknowledge that a party is not required to actually examine witnesses for an offer of proof, *Santiago v. State*, 644

N.W.2d 425, 442 (Minn.2002), that a formal offer of proof is unnecessary where the substance of the proposed testimony is apparent from cross examination, *Uhlman v. Farm Stock & Home Co.*, 126 Minn. 239, 244, 148 N.W. 102, 103 (Minn.1914), and that the Beckers were not required to affirmatively establish causation in their offer of proof. I also agree with the majority that the district court had already made its intentions clear with respect to this issue.

Nevertheless, in order to preserve their right to move for a new trial based on exclusion of reporting-related evidence, the Beckers were required to somehow place on the record the suggestion that a witness familiar with the handling of reports of suspected child abuse in Olmsted County was prepared to testify about the manner in which an earlier report may have prevented Nykkole's injuries. The record contains only the conclusory opinions of three identified individuals, unsupported by any foundation showing that the witnesses actually had experience with, or knowledge of, the relevant Olmsted County proceedings applicable when a report of suspected child abuse is received. I would affirm the district court's denial of the Beckers' motion for a new trial.

GILDEA, J. (dissenting).

I join in the dissent of Justice G. Barry Anderson.