Regina C. LOSEN, trustee for the heirs
and next-of-kin of Deborah Miller,
deceased, et al., Appellants,

v.

ALLINA HEALTH SYSTEM,
d/b/a United Hospital, et
al., Respondents,

Minnesota Epilepsy Group, P.A.,
et al., Respondents.

No. A08–1478.

Court of Appeals of Minnesota.

July 7, 2009.

Valerie R. LeMaster, John M. Dornik, Mackenzie & Dornik, P.A., Minneapolis, MN, for appellants.

Gregory P. Bulinski, Charles E. Lundberg, Paula M. Semrow, Bassford Remele, P.A., Minneapolis, MN, for respondents Allina Health System d/b/a United Hospital and Paul Goering, M.D.

Steven R. Schwegman, Kenneth H. Bayliss, Laura A. Moehrle, Quinlivan & Hughes, P.A., St. Cloud, MN, for respondents Minnesota Epilepsy Group, Deanna L. Dickens, M.D., and Patricia E. Penovich, M.D.

William L. Davidson, Lind, Jensen, Sullivan & Peterson, P.A., Minneapolis, MN, for amici curiae Minnesota Medical Association and Fairview Health Services.

Katherine Barrett Wiik, Anne E. Workman, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, for amicus curiae Minnesota Association for Justice.

Considered and decided by SHUMAKER, Presiding Judge; HALBROOKS, Judge; and CRIPPEN, Judge.*

## OPINION

HALBROOKS, Judge.

This appeal arises out of a medical-negligence and wrongful-death action against three physicians, a hospital, and a clinic for alleged negligent treatment of a patient who later killed his mother and injured his father and stepmother. Appellants assign error to the district court's grant of partial summary judgment arguing that immunity under Minn.Stat. § 253B.23, subd. 4, does not apply to respondents' good-faith decision to not place a 72–hour emergency hold on a proposed patient; alternatively, appellants assign error to the district court's determination that statutory immunity precludes a common-law claim of medical negligence. Because the good-faith decision to not place a hold on the proposed patient was made pursuant to the Minnesota Commitment and Treatment Act (CTA), we affirm. We also extend discretionary review to certain dismissed claims.

## FACTS

Ryan C. Miller (Ryan) was diagnosed with epilepsy at the age of two. For many years, physicians employed by respondent Minnesota Epilepsy Group, P.A. (MEG) provided treatment to him. In June 2003, an MEG physician altered then–25–year–old Ryan's seizure medication. After this

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to  Minn. Const. art. VI, § 10.

change, Ryan's family noticed that he was exhibiting bizarre behavior and experiencing auditory hallucinations.

On July 28, 2003, Ryan's mother, Deborah Miller, brought him to United Hospital, where he was seen by respondent Deanna L. Dickens, M.D., an MEG physician. Dr. Dickens noted that Ryan "present[ed] with an acute psychosis with medication change as the only potential correlate," and she requested a psychiatric consultation.

Respondent Paul Goering, M.D., a psychiatrist employed by United Hospital, subsequently examined Ryan. In his consultation report, Dr. Goering stated:

> I do think that [Ryan] would benefit from psychiatric intervention. I have discussed hospitalization (transfer) as well as antipsychotic medications. He adamantly refuses each, identifying, in his logic, that he does not need them. He declines to allow me to speak with his mother at all. He makes it clear that were he to leave the hospital, he would not agree to psychiatric followup but he would agree to continued compliance with epilepsy decisions related to his care.
>
> I do not see the patient as holdable given the absence of imminent risk. However, I am concerned about his long-term risk. He is moderately psychotic and he does have poor insight. As well, it appears that at least once recently he responded to hallucination by stopping his medications. If he develops more dangerous behavior, certainly the consideration of admitting him under a 72–hour hold would be reasonable.

Ryan was monitored overnight in the hospital to determine if he was experiencing seizures. On July 29, 2003, Ryan re-moved the monitoring equipment and an intravenous line, and he attempted to leave the hospital. The parties disagree as to the details of this incident, but do not challenge the district court's characterization of it: "[Ryan] was restrained by hospital staff from leaving. Before he was placed in restraints, he struggled with the staff, yelled profanities, and spit at staff. It was necessary to physically grab him by the arms and wrestle him to the ground in order to restrain him."

Dr. Dickens telephoned Dr. Goering, and the two discussed this incident. They decided that an emergency hold could not be placed on Ryan if he agreed to take all of his medications and to attend a follow-up visit with a psychiatrist. According to Dr. Dickens, Ryan was discharged on July 29, 2003 "after extensive counseling took place with the patient, his mother, father, and sister."[1] Dr. Dickens noted:

> The patient's father agreed to have the patient return home with him as long as the patient was willing to take his antiepileptic medications as well as Risperdal, the antipsychotic medication that Dr. Goering had suggested. Both the patient and family were in agreement with this plan. Family verbalized an understanding that the patient was not thinking clearly (i.e., psychotic) and that he was exhibiting impaired judgment. The plan was agreed upon for the patient to return home with his father with an agreement for the patient to take his antiepileptic medications as well as the Risperdal. The patient was also in agreement to have anticonvulsant levels checked in 1 week. Parents verbalized an understanding to call 911 if the patient's behavior became unmanageable or escalating or posed potential for harm to the patient or others. Family was

---

1. Ryan's parents were divorced at this time.

instructed to seek further psychiatric treatment and management for the patient as an outpatient. Additionally, family was instructed on safety concerning the removal of potentially harmful objects/weapons from the home while the patient was clearly exhibiting limited judgment and insight.

Dr. Dickens's discharge summary also indicated that Ryan was to follow up with respondent Patricia E. Penovich, M.D., another MEG physician.

After his discharge from United Hospital, Ryan's parents contacted MEG several times with concerns regarding his behavior and medication. On August 11, 2003, Randolph Miller, Ryan's father, called Dr. Penovich's office and requested that Ryan be taken off Risperdal, his antipsychotic medication, due to Ryan's drowsiness, fatigue, occasional slurred speech, and intermittent numbness in his face, legs, and arms. Ryan's father was advised that it was not safe to alter Ryan's medication before he was evaluated by a psychiatrist. Randolph Miller was advised to schedule an appointment for Ryan with a local psychiatrist. Randolph Miller's journal reflects that he and his ex-wife discussed the recommendation and decided not to schedule an appointment with a psychiatrist and instead to reduce Ryan's Risperdal dosage.

On August 12, 2003, Randolph Miller dropped Ryan off at his mother's home for a pre-arranged visit. When Randolph Miller returned home later, he saw Ryan wandering around by the driveway. When Randolph Miller approached Ryan, he saw that Ryan had a rifle. Ryan shot his father in the neck. Moments later, Ryan's stepmother pulled into the driveway; Ryan shot at her as well and continued firing until Randolph Miller was able to get into his wife's car and the two drove away. Both survived. Ryan's mother was later found dead in her home.

Ryan was charged with murder and attempted murder. His trial was bifurcated with the guilt phase tried first. Ryan was convicted of both crimes. The second phase of trial concerned Ryan's defense of insanity. The district court determined that Ryan was laboring under such a defect of reasoning that he did not know the nature of his acts or that they were wrong. As a result, Ryan was indeterminately committed to the Minnesota Security Hospital as mentally ill and dangerous.

On January 19, 2007, appellants Regina C. Losen (Ryan's sister, as trustee for the heirs and next-of-kin of their mother Deborah Miller), Randolph C. Miller (Ryan's father), and Laurie A. Miller (Ryan's stepmother) filed a complaint against respondents Allina Health System (United Hospital), MEG, Dr. Goering, Dr. Dickens, and Dr. Penovich. Appellants alleged that respondents were negligent in their treatment of Ryan by (1) prescribing an improper dosage of seizure medication, (2) failing to appropriately assess and treat his acute psychosis, (3) failing to properly and thoroughly assess him for the presence or absence of dangerousness, and (4) failing to place a 72–hour emergency hold on him.

On January 30, 3008, Dr. Goering and United Hospital moved for dismissal and/or summary judgment. The next day, MEG, Dr. Dickens, and Dr. Penovich (MEG, et al.) also moved for dismissal and/or summary judgment. The hearing on the motions took place on February 27, 2008.

The district court accepted respondents' argument that appellants' negligence claims, "involv[ing] the fact that neither Dr. Goering nor Dr. Dickens placed a 72–hour hold on Ryan," are barred by the

immunity provision of the CTA, Minn.Stat. § 253B.23, subd. 4. The district court (1) granted summary judgment for Dr. Goering and United Hospital on all claims and ordered entry of judgment in their favor; (2) granted summary judgment for MEG, et al. "for the claims of negligence made for failure to place a 72–hour hold on Ryan Miller"; and (3) denied summary judgment "as to the other negligence claims" against MEG, et al.

On July 10, 2008, judgment was entered in favor of United Hospital and Dr. Goering. Appellants filed their notice of appeal on August 26, 2008.

On September 22, 2008, this court issued a special-term order, finding that the district court "only has directed entry of a final, partial judgment on appellants' claims against [United Hospital] and [Dr.] Goering." This court ordered the parties to serve and file informal memoranda addressing whether a final, partial judgment had been entered adjudicating any of appellants' claims against MEG, et al. and if not, whether "the part of the appeal from the April 28, 2008 order granting summary judgment to [MEG, et al.] on the claim of failure to authorize a 72–hour hold [should] be dismissed."

On October 21, 2008, this court issued a second special-term order, deferring the issue of whether to grant discretionary review of the district court's dismissal of the claims against MEG, et al. related to the failure to authorize a 72–hour hold. MEG, Dr. Dickens, and Dr. Penovich were ordered to proceed as respondents to this appeal.

Amicus briefs have been received by this court from the Minnesota Association for Justice, the Minnesota Medical Association, and Fairview Health Services.

## ISSUES

I. Is it appropriate to grant discretionary review of the dismissal of certain claims against MEG, et al.?

II. Are appellants' claims related to respondents' alleged failure to institute an emergency hold barred by Minn. Stat. § 253B.23, subd. 4?

III. Do appellants' claims survive under a separate, common-law theory?

IV. Did the district court's application of the immunity provision of the CTA violate appellants' constitutional rights?

## ANALYSIS

### I.

■ The parties agree that the dismissal of the claims against MEG, et al. is not appealable as of right. MEG, et al. argue for discretionary review pursuant to Minn. R. Civ.App. P. 105.01, which states that "in the interests of justice the Court of Appeals may allow an appeal from an order not otherwise appealable." MEG, et al. contend that we should grant discretionary review rather than require them to bring a separate appeal. Because review of the dismissed claims against MEG, et al. involves the same narrow issue of statutory interpretation as the claims against other respondents, because of the expense and delay that a second appeal would entail, and because all parties agree that review is appropriate, we grant discretionary review of the district court's dismissal of the hold-related claims against MEG, et al. *See* Minn. R. Civ.App. P. 103.04 (stating that an appellate court may review any order affecting the appealed decision).

### II.

■ On appeal from summary judgment, we review de novo whether there

are any genuine issues of material fact and whether the district court erred in its application of the law. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.,* 644 N.W.2d 72, 76–77 (Minn.2002). The construction and application of a statute to the undisputed facts of a case involves a question of law, which this court reviews de novo. *In re Kleven,* 736 N.W.2d 707, 709 (Minn.App. 2007); *Davies v. W. Publ'g Co.,* 622 N.W.2d 836, 841 (Minn.App.2001), *review denied* (Minn. May 29, 2001).

■ In addition to providing the framework for civil commitment, the CTA prescribes the procedures for voluntary admission and treatment, Minn.Stat. § 253B.04 (2008), and emergency admission and treatment,[2] Minn.Stat. § 253B.05 (2008). Section 253B.05, subdivision 1, sets forth the procedure for instituting a 72–hour emergency hold:

(a) Any person may be admitted or held for emergency care and treatment in a treatment facility with the consent of the head of the treatment facility upon a written statement by an examiner [3] that:

(1) the examiner has examined the person not more than 15 days prior to admission;

(2) the examiner is of the opinion, for stated reasons, that the person is mentally ill, developmentally disabled, or chemically dependent, and is in danger of causing injury to self or others if not immediately detained; and

(3) an order of the court cannot be obtained in time to prevent the anticipated injury.

(b) If the proposed patient has been brought to the treatment facility by another person, the examiner shall make a good faith effort to obtain a statement of information that is available from that person, which must be taken into consideration in deciding whether to place the proposed patient on an emergency hold. The statement of information must include, to the extent available, direct observations of the proposed patient's behaviors, reliable knowledge of recent and past behavior, and information regarding psychiatric history, past treatment, and current mental health providers. . . .

(c) The examiner's statement shall be: (1) sufficient authority for a peace or health officer to transport a patient to a treatment facility, (2) stated in behavioral terms and not in conclusory language, and (3) of sufficient specificity to provide an adequate record for review. If danger to specific individuals is a basis for the emergency hold, the statement must identify those individuals, to the extent practicable. A copy of the examiner's statement shall be personally served on the person immediately upon admission and a copy shall be maintained by the treatment facility.

*Id.,* subd. 1.

The CTA also contains an immunity provision, which reads in relevant part:

All persons acting in good faith, upon either actual knowledge or information thought by them to be reliable, who act pursuant to any provision of this chapter or who procedurally or physically assist in the commitment of any individual,

---

2. " 'Emergency treatment' means the treatment of a patient pursuant to section 253B.05 which is necessary to protect the patient or others from immediate harm." Minn.Stat. § 253B.02, subd. 6 (2008).

3. "Examiner" refers to a licensed physician who is "knowledgeable, trained, and practicing in the diagnosis and assessment or in the treatment of the alleged impairment." Minn. Stat. § 253B.02, subd. 7 (2008).

pursuant to this chapter, are not subject to any civil or criminal liability under this chapter.

Minn.Stat. § 253B.23, subd. 4.

Appellants assert that the CTA's immunity provision does not apply because Ryan was never committed. Appellants also assert that the "affirmative decision not to initiate an emergency hold procedure" is not covered by the immunity provision. We disagree with appellants' interpretation of the CTA.

In *Mjolsness v. Riley*, this court addressed the application of the CTA's immunity provision. 524 N.W.2d 528 (Minn. App.1994). In that case, Mjolsness's friend, Riley, telephoned 911 because he was concerned that Mjolsness might commit suicide. *Id.* at 529. Mjolsness was taken into custody and held at a crisis-intervention center for 72 hours pursuant to the emergency-admission section of the CTA. *Id.* An involuntary commitment proceeding was also instituted but later dismissed by the district court. *Id.* at 529–30. Mjolsness sued Riley for the latter's "participation in the effort to commit him." *Id.* at 530. Mjolsness argued that Riley was not entitled to immunity because the commitment petition was ultimately dismissed. *Id.* at 531. We disagreed:

> To hold Riley liable because Mjolsness was not ultimately committed would be contrary to the statute's broad grant of immunity. The statute's plain language unambiguously applies to *all* persons acting in good faith and its grant of immunity is not limited to persons who are successful in their efforts to commit someone.

*Id.* In addressing whether Riley was subject to liability, this court noted that the CTA "provides complete immunity from suit, not simply a defense to liability." *Id.*

at 530. In the absence of any evidence that Riley acted in bad faith "in participating in the effort to commit [Mjolsness] under [the CTA]," this court upheld summary judgment for Riley on the ground of statutory immunity. *Id.* at 531. In light of *Mjolsness,* appellants' argument—that immunity under the CTA does not apply because Ryan was never committed—is without merit.

The question before this court is whether an examiner's good-faith[4] determination that a proposed patient does not meet the statutory criteria for an emergency hold qualifies as an act "pursuant to any provision of [the CTA]" within the meaning of Minn.Stat. § 253B.23, subd. 4. We conclude that the CTA encompasses the good-faith decision whether to place an emergency hold on a proposed patient, even if the result of that decision is that no hold is placed.

■ "When interpreting a statute, we first look to see whether the statute's language, on its face, is clear or ambiguous. A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) (citation and quotation omitted). The language of the immunity provision is not ambiguous—it clearly grants immunity to any person acting in good faith pursuant to any provision of the CTA.

Minn.Stat. § 253B.05, subd. 1(b), states in relevant part:

> If the *proposed patient* has been brought to the treatment facility by another person, the examiner shall make a good faith effort to obtain a statement of information that is available from that person, which must be taken into consid-

---

4. Appellants do not claim that respondents    did not act in good faith.

eration *in deciding whether to place the proposed patient on an emergency hold.*

(Emphases added.) This provision contemplates an examiner being faced with a "proposed patient." Minn.Stat. § 253B.05, subd. 1(b). While the CTA does not define "proposed patient," a patient is "any person who is receiving treatment or committed under this chapter." Minn.Stat. § 253B.02, subd. 15 (2008). The adjective "proposed" is defined as "[p]ut forward for consideration or adoption." 2 *The Compact Edition of the Oxford English Dictionary* 2330 (1987). The plain meaning of "proposed patient" is therefore a person who has not yet been admitted or held for emergency care. Once a hold is placed, a proposed patient becomes a "patient" as defined by the CTA—that is, someone who *is receiving treatment.* Ryan, whose physicians considered placing a hold on him but did not institute a hold, was a proposed patient.

An examiner's decision *"whether* to place the proposed patient on an emergency hold" is clearly encompassed by the CTA. Minn.Stat. § 253B.05, subd. 1(b) (emphasis added). The word "whether" can be used "to introduce alternative possibilities." *The American Heritage Dictionary of the English Language* 2033 (3d ed. 1992). The decision whether to place a proposed patient on an emergency hold therefore has two possible results: a hold is placed or a hold is not placed. Furthermore, an examiner is to follow the procedure outlined in section 253B.05, subdivision 1(b), regardless of whether a hold is ultimately placed. Finally, the interpretation that the decision itself is an act pursuant to the CTA is consistent with *Mjolsness,* wherein immunity was granted for participation in the commitment process despite the fact that the person ultimately was not committed. *See Mjolsness,* 524 N.W.2d at 531.

We therefore hold that an examiner's good-faith determination that a proposed patient does not meet the statutory criteria for an emergency hold qualifies as an act "pursuant to any provision of [the CTA]" under Minn.Stat. § 253B.23, subd. 4. Respondents are therefore entitled to statutory immunity, and the claims against them for failure to place a 72–hour hold on Ryan were properly dismissed.

**III.**

■ Appellants argue that common-law medical-negligence claims are "separate and distinct from claims arising out of the [CTA]" and therefore the former can survive the application of statutory immunity. Appellants assert that *Bruegger v. Faribault County Sheriff's Dep't,* 497 N.W.2d 260 (Minn.1993), and *Becker v. Mayo Found.,* 737 N.W.2d 200 (Minn.2007), support their argument.

In *Bruegger,* the supreme court addressed whether a law-enforcement agency was subject to civil liability for failure to inform a minor crime-victim's parents of their rights under the Crime Victims Reparations Act. 497 N.W.2d at 260. The supreme court held that there was no common-law duty requiring the sheriff's department to inform the parents of their potential rights. *Id.* at 262. The supreme court did not address the applicability of any immunity provision. It is unclear how *Bruegger* supports appellants' position.

In *Becker,* the supreme court addressed whether physicians could be held civilly liable for failure to report child abuse under the Minnesota Child Abuse Reporting Act (CARA). 737 N.W.2d at 203. The supreme court held that although CARA did not create a civil cause of action for failure to report suspected child abuse, a claim that the physicians "deviated from the expected standard of professional skill and care by not reporting suspected child

abuse to outside authorities ... is distinct from the civil cause of action based on CARA that we rejected above." *Id.* at 208–09, 213–14. Contrary to appellants' assertions here, the supreme court did not hold in *Becker* that medical-negligence claims could survive the application of statutory immunity; rather, statutory immunity was held not to apply. *See id.* at 211 (noting that the CARA immunity provision "grants civil immunity to those who report," but "says nothing about those who fail to report").

Appellants have therefore failed to cite any legal authority for the proposition that their claims related to the decision not to institute an emergency hold on Ryan can survive the application of statutory immunity. Nor do appellants explain how the CTA immunity provision would retain any meaning if such claims were allowed to proceed. In effect, appellants ask us to eviscerate the immunity provision by replacing the "good faith" standard of the CTA with one of negligence. But this court is "without authority to change the law." *Lake George Park, L.L.C. v. IBM Mid–Am. Employees Fed. Credit Union,* 576 N.W.2d 463, 466 (Minn.App.1998), *review denied* (Minn. June 17, 1998).

### IV.

Appellants appear to argue that the CTA is unconstitutional as applied by the district court because it violates their right to redress. *See* Minn. Const. art I, § 8. Appellants raise this issue for the first time on appeal, and constitutional issues generally will not be addressed for the first time on appeal. *See In re Welfare of C.L.L.,* 310 N.W.2d 555, 557 (Minn.1981). Furthermore, appellants did not notify the attorney general of their challenge to the constitutionality of the CTA. *See* Minn. R. Civ.App. P. 144. We therefore decline to consider appellants' constitutional argument.

### DECISION

Because the good-faith decision not to institute an emergency hold on Ryan was an act done pursuant to the CTA, statutory immunity bars the claims of appellants that are related to respondents' alleged failure to institute a hold.

**Affirmed.**